**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT,<br><br>Plaintiffs,<br><br>v.<br><br>WIREGRASS CONSTRUCTION COMPANY, INC.,<br><br>Defendant. | Civil Action No. _2:26-cv-00571 |

# CONSENT DECREE

WHEREAS, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed the Complaint in this action concurrently with the lodging of the proposed Consent Decree ("Decree"), alleging that Defendant Wiregrass Construction Company, Inc. ("Wiregrass" or "Defendant") violated Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a);

WHEREAS, Plaintiff Alabama Department of Environmental Management ("ADEM"), an agency of the State of Alabama, joined the Complaint, alleging that Defendant violated the Alabama Water Pollution Control Act ("AWPCA"), Alabama Code 22-22-1 *et seq*, and the regulations promulgated pursuant thereto;

WHEREAS, the Complaint alleges that Defendant, commencing in November of 2007 and continuing through April of 2018, during the course of sand and gravel mining and processing operations, violated CWA Section 301(a) by discharging dredged or fill material into

waters of the United States without a dredge-or-fill permit issued by the United States Army Corps of Engineers (the "Corps") pursuant to CWA Section 404 at the "Poly Pit Site," an approximately 750-acre property in Macon County, Alabama located on Banks McDade Road, approximately three miles northwest of Shorter, Alabama, near 32.402526° north latitude and 85.991582° west longitude;

WHEREAS, the Complaint alleges that Defendant, commencing in November of 2007 and continuing to the present date, also violated CWA Section 301(a) and Section 22-22-9 of the Alabama Code at the Poly Pit Site by discharging pollutants (other than dredged or fill material) into waters of the United States and waters of the State without a National Pollutant Discharge Elimination System ("NPDES") permit issued by ADEM, which at all relevant times has been authorized by EPA to administer the NPDES permit program in the State of Alabama pursuant to CWA Section 402;

WHEREAS, the Complaint alleges that Defendant, commencing in November of 2007 and continuing to the present date, also violated CWA Section 301(a) and Section 22-22-9 of the Alabama Code at the Poly Pit Site by failing to comply with the conditions of a National Pollutant Discharge Elimination System ("NPDES") permit issued by ADEM;

WHEREAS, the Complaint separately alleges that Defendant, commencing approximately in November 2017 and continuing until the present, during and following the course of sand and gravel processing operations, violated CWA Section 301(a) and Section 22-22-9 of the Alabama Code at the "Trace Pit Site," an approximately 400-acre tract north and south of County Road 85, in Deatsville, Autauga County, Alabama, near 32.625º north latitude

and 86.426º west longitude, by discharging pollutants (other than dredged or fill material) into waters of the United States and waters of the State without a NPDES permit issued by ADEM; WHEREAS, the Complaint alleges that Defendant, commencing approximately in November 2017 and continuing until the present, also violated CWA Section 301(a) and Section 22-22-9 of the Alabama Code at the Trace Pit Site by failing to comply with the conditions of a NPDES permit issued by ADEM;

WHEREAS, the Complaint seeks (1) to enjoin the discharge of pollutants into waters of the United States and waters of the State, in violation of CWA Section 301(a), 33 U.S.C. § 1311(a), and Section 22-22-9 of the Alabama Code; (2) to require Defendant, at its own expense and at the direction of EPA and ADEM, to restore and/or mitigate the damages caused by their unlawful activities; and (3) to require Defendant to pay civil penalties to the United States and ADEM as provided in 33 U.S.C. § 1319(d) and the Alabama Environmental Management Act ("AEMA"), Ala. Code § 22-22A-18.

WHEREAS, the United States, ADEM, and Defendant agree and recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony upon the pleadings, without the adjudication or admission of any issue of fact or law except as provided in Section I of this Consent Decree, and with the consent of the Parties, IT IS HEREBY ORDERED, ADJUDGED, and DECREED as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the federal law claims in the Complaint pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the CWA, 33 U.S.C. § 1319(b). This Court has supplemental jurisdiction over the state law claims in the Complaint pursuant to 28 U.S.C. § 1367. The Court has personal jurisdiction over Defendant.

2. Venue lies in this judicial district pursuant to Section 309(b) of the CWA, 33 U.S.C. §1319(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations alleged in the Complaint occurred in this judicial district and Defendant conducts business in in this judicial district.

3. For purposes of this Consent Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action and over Defendant and consents to venue in this judicial district.

4. For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 301, 309, 402, and 404 of the CWA, 33 U.S.C. §§ 1311, 1319, 1342, and 1344, and Section 22-22A-5(18)b. of the AEMA.

## II. APPLICABILITY

5. The obligations of this Consent Decree apply to and are binding upon the United States and ADEM, and upon Defendant and any successors, assigns, or other persons otherwise bound by law whether or not any such person has notice of this Consent Decree.

6. In any action to enforce this Consent Decree against Defendant, Defendant shall not raise as a defense the failure of any of its officers, directors, agents, employees, successors,

assigns, contractors, consultants, or any person acting in concert or participation with Defendant, to take any actions necessary to comply with the provisions of this Decree.

7. Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, including, for example, any contractor or consultant retained to perform injunctive relief required under this Consent Decree. Defendant shall condition any such contract upon performance that conforms to the terms of this Consent Decree. The United States shall not be considered a party to any such contract.

8. No transfer of ownership or other interest in the Trace Pit Site and/or Poly Pit Site, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Consent Decree are implemented. As a condition of any such transfer, Defendant shall reserve all rights necessary to comply with this Consent Decree. At least 30 Days prior to such transfer, Defendant shall provide a copy of this Decree to the proposed transferee and provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to the United States and ADEM in accordance with Section XI (Notices). If Defendant purports to transfer ownership or other interest in the Site without complying with this Paragraph, such conduct shall constitute a violation of this Consent Decree, and any such purported transfer shall be deemed void.

9. It is the express purpose of the Parties in entering this Consent Decree to further the objective set forth in CWA Section 101(a), 33 U.S.C. § 1251(a) and the objectives set forth in Ala. Code Section 22-22-2.

## III. DEFINITIONS

10. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a. "ADEM" means the Alabama Department of Environmental Management and any of its successor departments or agencies.

b. "AWPCA" means the Alabama Water Pollution Control Act, Alabama Code § 22-22-1 *et seq.*

c. "Calendar Quarter" means the three (3)-Month periods ending on March 31, June 30, September 30, and December 31.

d. "Complaint" means the complaint filed by the United States and ADEM in this action.

e. "Consent Decree" or "Decree" means this Decree and all appendices listed in Section XXIII (Appendices), all Deliverables approved by the United States in accordance with Section VII (Deliverables), and all modifications made effective in accordance with Section XVII (Modification).

f. "Corps" means the United States Army Corps of Engineers and any of its successor departments or agencies.

g. "CWA" means the Clean Water Act, 33 U.S.C. §§ 1251-1387.

h. "Day" means a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the next business day.

i. "Defendant" or "Wiregrass" means Wiregrass Construction Company, Inc.

j. "Deliverable" means any document (including plans, notices, and reports) that this Consent Decree requires or allows to be submitted to EPA and/or ADEM for review and approval pursuant to Section VII (Deliverables).

k. "DOJ" means the United States Department of Justice and any of its successor departments or agencies.

l. "Effective Date" means the date provided in Section XV (Effective Date).

m. "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

n. "Month" means one (1) calendar month running from the numbered day to the same numbered day of the following calendar month, regardless of whether the particular month has 28, 29, 30 or 31 days. In the event a triggered event would occur on a day of the month which does not exist (for example, on February 30), then the event shall be due on the first day of the following month (for example, March 1).

o. "Paragraph" means a portion of this Decree identified by an Arabic numeral.

p. "Parties" means the United States, ADEM, and Defendant.

q. "Poly Pit" or "Poly Pit Site" means the approximately 750-acre property in Macon County, Alabama located on Banks McDade Road, approximately three miles northwest of Shorter, Alabama, near 32.402526° north latitude and 85.991582° west longitude, and shown on the map that is attached to this Consent Decree as Appendix 1 to this Consent Decree.

r. “Poly Pit and Trace Pit Restoration and Mitigation Plan” means the Comprehensive Corrective Action Work Plan (“Plan”) appended to this Consent Decree as Appendix 3.

s. “Request for Termination” means the written request presented by Defendant to the United States and ADEM in accordance with Section XVIII (Termination).

t. “Section,” when not in conjunction with the CWA (e.g., “CWA Section 301(a)” or “Section 404 of the CWA”), means a portion of this Decree identified by a Roman numeral.

u. “State” or “State of Alabama” shall mean the State of Alabama, including all its departments, agencies, and instrumentalities, and any successor departments, agencies, and instrumentalities.

v. “Trace Pit” or “Trace Pit Site” means the approximately 400-acre tract north and south of County Road 85, in Deatsville, Autauga County, Alabama, near 32.625º north latitude and 86.426º west longitude, and shown on the map that is attached to this Consent Decree as Appendix 2 to this Consent Decree.

w. “United States” shall mean the United States of America, acting on behalf of EPA.

## IV. <u>CIVIL PENALTY</u>

11. Within 30 Days after the Effective Date, Defendant shall pay the sum of $450,000 as a civil penalty, $225,000 of which shall be paid to the United States and $225,000 of which shall be paid to ADEM.

12. Defendant shall make the above-referenced payment to the United States by FedWire Electronic Funds Transfer to the DOJ account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Middle District of Alabama after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify its payment. The FLU will provide the payment instructions to:

Brent Earl Wood
Authorized Agent for Wiregrass Construction
Company 1830 Hartford Hwy, Dothan, AL 36301
bwood@constructionpartners.net

on behalf of the Defendant. Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States in accordance with Section XI (Notices).

13. Defendant shall make the above-referenced payment to ADEM by corporate check payable to: "Alabama Department of Environmental Management" and delivered to:

Alabama Department of Environmental Management
Montgomery Office
ATTN: Office of General Counsel
1400 Coliseum Boulevard
Montgomery, AL 36110-2400

14. At the time of payment to the United States, Defendant shall send notice that payment has been made (i) to the United States at the addresses specified in Section XI (Notices); and (ii) to EPA's Finance Office via email at cinwd_acctsreceivable@epa.gov. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in

*United States v. Wiregrass Construction Co.* and shall reference the civil action number, court, CDCS Number, and DOJ DJ# 90-5-1-1-21605.

15. At the time of payment to ADEM, Defendant shall send notice that payment has been made to ADEM at the addresses specified in Section XI (Notices).

16. Defendant shall not deduct any penalties paid under this Decree pursuant to this Section or Section VI (Stipulated Penalties) in calculating its federal, state, or local income tax.

17. Defendant shall not deduct any penalties paid under this Decree pursuant to this Section or Section VI (Stipulated Penalties) in calculating its federal, state, or local income tax.

## V. INJUNCTIVE RELIEF

18. Except as necessary to fulfill the restoration requirements of this Consent Decree, Defendant and its agent, successors, and assigns are enjoined from discharging any pollutant into waters of the United States at the Trace Pit Site and/or Poly Pit Site, unless such discharge complies with the provisions of the CWA and regulations promulgated pursuant to the CWA.

19. Qualified Consultant: Defendant shall submit plans regarding, and implement, the restoration and mitigation requirements in Paragraphs 20-21 under the oversight of TTL, Inc., Five Smooth Stones Restoration, or another qualified environmental consultant with expertise in wetland and stream restoration and mitigation.

20. Poly Pit and Trace Pit Restoration and Mitigation: Defendant shall implement the Poly Pit and Trace Pit Restoration and Mitigation Plan (the "Plan") attached as Appendix 3 to this Consent Decree in accordance with the schedule contained therein.

a. When Defendant believes that it has completed all restoration and mitigation work, Defendant shall submit as a Deliverable pursuant to Section VII

(Deliverables) a report describing and documenting the work that has been completed. EPA, after consultation with ADEM, may either approve the report and agree that the work has been completed or schedule an inspection to confirm the completion of the work. EPA may identify areas in which the Defendant's work fails to meet the performance criteria set forth in the Plan or does not otherwise comply with the Plan and direct that Defendant conduct additional work to bring its work into compliance within a reasonable timeframe, taking into consideration the nature of the additional work required. Upon written notification to Defendant by EPA and ADEM in accordance with Section XI (Notices) that the Plan has been successfully implemented, the monitoring period described in Paragraph 20(b) shall commence.

b. Successful implementation of the Plan by Defendant shall be confirmed in the following manner:

i. Following completion of restoration work required under the Plan, monitoring shall occur in accordance with the Plan. Following the monitoring period outlined in the Plan, and upon achievement of the performance criteria defined in the Plan, Defendant shall provide written notice in accordance with Section XI (Notices) to EPA and ADEM that the restoration is complete. EPA will schedule an inspection to confirm that the restoration is complete.

21. Following inspection by EPA and after consultation with ADEM, EPA will either confirm that restoration is complete or identify any additional work that is necessary to achieve

success criteria. If EPA notifies Defendant that additional work is necessary to achieve success criteria, Defendant will complete such additional work described by EPA in its notification within a reasonable timeframe, taking into consideration the nature of the additional work, identified by EPA in the notification. After completing the additional work, Defendant will contact EPA to schedule an inspection to confirm that the additional work has been completed.

22. In any future CWA permit application for discharges not authorized by Nationwide Permit 32 as provided herein, Defendant shall not rely upon: (a) the on-Site work required under this Consent Decree, as part of any avoidance and minimization measures demonstration associated with such application or as part of any mitigation proposal associated with such application; or (b) the mitigation required under this Consent Decree, as part of any mitigation proposal associated with such application.

23. Permits: Where any obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section X (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

24. Nationwide Permit 32: The Parties acknowledge that as of the Effective Date, Nationwide Permit 32 provides CWA Section 404 authorization, subject to the conditions provided in Nationwide Permit 32 and this Consent Decree, for the discharge of dredged or fill

material that is necessary for Defendant to fulfill the restoration requirements of this Consent Decree at both the Trace Pit Site and the Poly Pit Site, and for the previously unauthorized discharges of dredged and/or fill material that are remaining in place or will not be fully restored pursuant to this Consent Decree at the Poly Pit Site. In addition, Nationwide Permit 32 will provide authorization for the existing but previously unauthorized road crossing located at or near latitude 32.627023, longitude -86.431642 on the unnamed tributary referred to as UT3 on the Trace Pit Site, which road crossing will be used by Defendant in implementing the Plan and may remain in place following completion of work required by the Plan

## VI. STIPULATED PENALTIES

25. Defendant shall be liable for stipulated penalties to the United States and ADEM for violations of this Consent Decree as specified below, unless excused under Section X (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any Appendix listed in Section XXIII and any Deliverable approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

26. Late Payment of Civil Penalty. If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $2,000 per Day for each Day that the payment is late.

27. Non-compliance with injunctive relief.

a. The following stipulated penalties shall accrue per violation per Day for each violation of each of the various prohibitions and obligations set forth in Section V (Injunctive Relief):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500.00 | 1st through 14th Day |
| $1,000.00 | 15th through 30th Day |
| $2,000.00 | 31st Day and beyond |

28. Defendant shall pay any stipulated penalty within thirty (30) Days after the United States, in consultation with ADEM, serves a written demand in accordance with Section XI (Notices). Defendant shall pay half of the amount due to the United States, and Defendant shall pay the remaining half to ADEM. Defendant shall make payment to the United States and ADEM in accordance with any instructions included with the written demand.

29. The United States, in consultation ADEM, may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

30. Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

31. Stipulated penalties shall continue to accrue during the procedures of Section VIII (Dispute Resolution), but need not be paid until the following:

a. If the dispute is resolved by agreement of the Parties or by a decision of the United States, in consultation with ADEM, that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together

with interest, to the United States within thirty (30) Days after the effective date of the agreement or service of the United States' decision.

b. If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days after service of the Court's decision or order, except as provided in subparagraph c, below.

c. If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days after the appellate court's service of its mandate.

32. If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or ADEM from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

33. The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree.

34. Stipulated penalties are not the United States' or ADEM's exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XII (Scope and Effect /Reservation of Rights), the United States and ADEM expressly reserve the right to seek any other relief it deems appropriate for Defendant's violation of this Decree or applicable law, including but not limited to an action against Defendant for statutory penalties, additional

injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## VII. DELIVERABLES

35. After Defendant submits any Deliverable required by this Consent Decree, EPA, after consultation with ADEM, shall in writing:

a. Approve the submission as written;

b. Approve the submission upon specified conditions;

c. Approve part of the submission and disapprove the remainder; or

d. Disapprove the submission.

36. If EPA approves the Deliverable submission as written, Defendant shall act in accordance with the schedules and requirements of the Deliverable, as approved. If EPA approves the submission upon specified conditions, or approves the submission only in part, Defendant shall, upon written direction from EPA, take all actions required by the approved portions of the submission that EPA determinates are technically severable from any disapproved portions.

37. If EPA disapproves the Deliverable submission in whole or in part, Defendant shall, within 30 Days after EPA serves such disapproval (or such other time as the Parties agree to in writing), correct all deficiencies and resubmit the Deliverable, or disapproved portion thereof, for approval in accordance with the preceding Paragraphs in this Section. If and to the extent that EPA approves the Deliverable resubmission in whole or in part, Defendant shall proceed in accordance with the immediately preceding Paragraph in this Section.

38. If and to the extent that EPA disapproves in whole or in part the Deliverable resubmission, EPA, after consultation with ADEM, may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs in this Section, or EPA, in consultation with ADEM and after fifteen (15) Days' notice to Defendant, may itself correct any deficiencies.

39. Any approved Deliverable submission or resubmission shall be incorporated into and become enforceable under this Consent Decree, and Defendant shall implement such Deliverable according to its terms.

40. If Defendant elects to invoke the procedures of Section VIII (Dispute Resolution) where applicable in this Section VII (Deliverables), Defendant shall do so by sending a notice of dispute in accordance with Section VIII (Dispute Resolution) within 30 Days (or such other time as the Parties agree in writing) after EPA serves the relevant decision (or such other time as the Parties agree to in writing).

41. Any stipulated penalties applicable to the original Deliverable submission, as provided in Section VI (Stipulated Penalties) shall accrue during the 30-Day (or other agreed-upon) period that Defendant has to correct all deficiencies and resubmit the Deliverable, or disapproved portion thereof, for approval, but shall not be payable unless the resubmission is untimely or EPA disapproves it in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Consent Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

## VIII. DISPUTE RESOLUTION

42. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section concerning an issue of which it had notice and an opportunity to dispute under this Section prior to an action by the United States or ADEM to enforce any obligation of Defendant arising under this Decree precludes Defendant from raising any such issue as a defense to any such enforcement action.

43. Informal Dispute Resolution. Any dispute subject to the procedures in this Section (Dispute Resolution) shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States and ADEM a written notice at the addresses set forth in Section XI (Notices). Such notice shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 30 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States (or, as applicable, EPA) shall be considered binding unless, within 30 days after the conclusion of the informal negotiation period, the Defendant invokes formal dispute resolution procedures as set forth below in this Section.

44. Formal Dispute Resolution. To properly invoke the formal dispute resolution procedures in this Section, Defendant shall, within the time period provided in the preceding Paragraph, serve the United States and ADEM at the addresses set forth in Section XI (Notices) a written statement of position regarding the matter in dispute. Defendant shall include in its

statement of position any relevant information supporting Defendant's position and any supporting documentation relied upon by Defendant.

45. The United States, in consultation with ADEM, shall serve its response, which may include any relevant information supporting its position within 45 Days after Defendant serves its statement of position. The United States' response is binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

46. Judicial Dispute Resolution. Defendant may seek judicial review of the dispute by filing with the Court a motion requesting judicial resolution of the dispute. The motion (a) must be filed within 21 Days after service of the United States' response pursuant to the preceding Paragraph; (b) may not raise any issue not raised in the informal dispute resolution process required by this Section, unless the United States raises a new issue of law or fact in its response; (c) shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation; and (d) shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

47. The United States and ADEM (jointly or separately, at their election) shall respond to Defendant's motion within 21 Days after service of Defendant's Motion. Defendant may file a reply memorandum within 7 Days after service of the response, if any.

48. Standard of Review. Defendant shall bear the burden of demonstrating that the United States' and ADEM's position is not in accordance with the objectives of this Consent

Decree, the CWA, and the AWPCA, and that Defendant's position will achieve compliance with the terms and conditions of this Consent Decree, the CWA, and the AWPCA.

49. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Section VI (Stipulated Penalties). EPA will take into account the duration of judicial review in the exercise of its discretion to waive or reduce stipulated penalties otherwise due, as authorized under Paragraph 29 above. If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VI (Stipulated Penalties).

## IX. SITE ACCESS AND INFORMATION COLLECTION AND RETENTION

51. The United States and the State of Alabama, and their representatives, including attorneys, contractors, consultants, and agency (EPA and ADEM) personnel, shall have the right of entry into the Poly Pit Site and Trace Pit Site at all reasonable times, upon presentation of credentials, to:

a. monitor the progress of the stabilization and restoration work required under this Consent Decree;

b. verify any data or information submitted to the United States and ADEM in accordance with the terms of the Consent Decree;

c. obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

d. obtain documentary evidence, including photographs and similar data; and

e. assess Defendant's compliance with this Consent Decree.

52. Upon written request, Defendant shall provide to the United States and ADEM or their authorized representatives splits of any samples taken by Defendant. Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States and ADEM, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

53. At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States and ADEM, at the addresses set forth in Section XI (Notices), at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States and ADEM, Defendant shall deliver any such documents, records, or other information to the United States and ADEM. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, it shall provide the following in writing: (a) the title of the document, record, or information; (b) the date of the

document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

54. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States, including EPA, or the State of Alabama, including ADEM, pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## X. FORCE MAJEURE

55. "Force majeure," for purposes of this Consent Decree, means any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation. The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that any delay or non-performance is, and any adverse effects of the delay are, minimized to the greatest extent possible. "Force majeure" does not include, for example, financial inability to perform any obligation under this Consent Decree; increased costs of performance; changed economic circumstances; changed labor relations; normal precipitation or climate events; changed

circumstances arising out of the sale, lease, or other transfer or conveyance of title or ownership or possession of a site; or failure to obtain federal, state, or local permits if Defendant has not submitted timely and complete applications or has not taken all other actions necessary to obtain all such permits.

56. If any event occurs for which Defendant will or may claim a force majeure, Defendant shall provide notice to EPA and ADEM at the email addresses set forth in Section XI (Notices), within 96 hours after Defendant first knew or should have known that the event would likely delay or prevent performance. Defendant shall be deemed to know of any circumstance of which any contractor or, subcontractor of, or entity controlled by Defendant knew or should have known.

57. If Defendant seeks to assert a claim of force majeure, within seven days after Defendant serves the notice required in the preceding Paragraph, Defendant shall submit a further written notice to EPA and ADEM that includes: (a) an explanation and description of the event and its effect on Defendant's completion of the requirements of the Consent Decree; (b) a description and schedule of all actions taken or to be taken to prevent or minimize the delay and/or other adverse effects of the event; (c) if applicable, the proposed extension of time for Defendant to complete the requirements of the Consent Decree; (d) Defendant's rationale for attributing such delay to a force majeure; (e) a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health or welfare or the environment; and (f) all available proof supporting Defendant's claim that the delay was attributable to a force majeure.

58. Failure to submit a timely or complete notice or claim under the preceding two Paragraphs regarding any particular event precludes Defendant from asserting any claim of force majeure regarding such event, provided, however, that the United States, in consultation with ADEM, may, in its unreviewable discretion, excuse such failure if it is able to assess to its satisfaction whether the event is a force majeure, and whether Defendant has exercised its best efforts in accordance with the first Paragraph in this Section.

59. EPA, in consultation with ADEM, after a reasonable opportunity to review Defendant's force majeure claim, shall notify Defendant of its determination whether Defendant is entitled to relief under this Section and, if so, the excuse of, or the extension of time for, performance of the obligations affected by the force majeure event. An excuse of, or extension of the time for performance of, the obligations affected by the force majeure event does not, by itself, excuse or extend the time for performance of any other obligation.

60. If Defendant elects to invoke the dispute resolution procedures set forth in Section VIII (Dispute Resolution), it shall do so no later than 15 days after EPA services its determination under the preceding Paragraph. In any such proceeding, Defendant shall have the burden of proving that it is entitled to relief under this Section, that its proposed excuse or extension was or will be warranted under the circumstances, and that Defendant complied with the requirements of this Section. If Defendant carries this burden, the delay or non-performance at issue shall be deemed not to be a violation by Defendant of the affected obligations of this Consent Decree identified to the United States, ADEM, and the Court.

## XI. NOTICES

61. Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and sent by email and/or regular mail addressed as specified below.

Section Chief
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
150 M Street NE
Washington, DC. 20002

and

martha.mann@usdoj.gov

and:

US EPA Region 4
Water Enforcement Branch
Enforcement and Compliance Assurance Division
61 Forsyth St., SW
Atlanta GA 30303

a. As to EPA:

US EPA Region 4
Water Enforcement Branch
Enforcement and Compliance Assurance Division
61 Forsyth St., SW
Atlanta GA 30303

and:

parker.christopher@epa.gov

b. As to ADEM:

Alabama Department of Environmental Management
Montgomery Office
ATTN: Jimbo Carlson, Chief, Stormwater Management
P.O. Box 301463
Montgomery, AL 36130-1463

c. As to Defendant:

W.L. Radney IV
Lightfoot, Franklin & White LLC
400 20th Street North
Birmingham, AL 35203

Brent Earl Wood and bwood@constructionpartners.net
Construction Partners, Inc.
701 Corporate Center Drive
Suite 101
Raleigh, NC 27607

Ryan Brooks and rbrooks@constructionpartners.net
Construction Partners, Inc.
200 Park Lane
Suite 630
Dothan, AL 36305

Wiregrass Construction Company, c/o CAPITOL CORPORATE SERVICES INC,
2 North Jackson Street
Suite 605
Montgomery, AL 36104

62. Any Party may, by written notice to the other Parties in accordance with this Section, change its designated notice recipient or notice address provided above.

63. Notices submitted pursuant to this Section shall be deemed submitted upon transmission by email, or in the case of notice recipients where no email address is included in the notice address, upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XII. SCOPE AND EFFECT/RESERVATION OF RIGHTS

64. This Consent Decree resolves and shall constitute a complete and final settlement only of the civil claims of the United States and ADEM alleged in the Complaint through the date of the lodging of this Consent Decree, subject to Defendant's compliance with this Consent Decree.

65. The United States and ADEM reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree and applicable law. This Consent Decree shall not be construed to limit the rights of the United States or the State to obtain penalties or injunctive relief under federal or state laws, regulations, or permit conditions, except as specified in the immediately preceding Paragraph in this Section.

66. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, other appropriate relief relating to the Sites and/or additional sites, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 64.

67. Except as otherwise specifically provided herein, this Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this

Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and ADEM do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with any provisions of federal, State, or local laws, regulations, or permits.

68. Nothing in this Consent Decree shall limit the ability of the Corps to issue, modify, suspend, revoke, or deny any individual permit or any nationwide or regional permit, nor shall this Consent Decree limit EPA's ability to exercise its authority pursuant to Section 404(c) of the CWA, 33 U.S.C. § 1344(c).

69. This Consent Decree does not limit or affect the rights of Defendant or of the United States and ADEM against any third parties to this Consent Decree, nor does it limit the rights of third parties against Defendant, except as otherwise provided by law.

70. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party to this Consent Decree.

## XIII. COSTS

71. The Parties shall bear their own costs of this action, including attorneys' fees, except that, should Defendant subsequently be determined by the Court to have violated any provision of this Consent Decree, the United States and ADEM shall be entitled to collect the costs, including attorneys' fees, incurred in any action to enforce this Consent Decree.

## XIV. PUBLIC COMMENT

72. The Parties acknowledge that this Consent Decree was lodged with the Court for a period of not less than thirty (30) Days to allow for public notice and comment in

accordance with 28 C.F.R. § 50.7. The United States reserved the right to withhold or withdraw its consent to the entry of this Consent Decree if the comments regarding the Consent Decree disclose facts or consideration indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendant consented to entry of this Consent Decree without further notice and agreed not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States notified Defendant in writing that it no longer supports entry of the Consent Decree. No comments were received in response to the public notice.

## XV. EFFECTIVE DATE

73. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI. RETENTION OF JURISDICTION

74. This Court retains jurisdiction over this action until termination of this Consent Decree pursuant to Section XVIII (Termination) for the purposes of resolving disputes arising under this Consent Decree, entering orders modifying this Consent Decree pursuant to its applicable terms or applicable law, or effectuating or enforcing compliance with the terms of this Consent Decree.

## XVII. MODIFICATION

75. The terms of this Consent Decree, including any attached Appendices listed in Section XXIII and Deliverable approved pursuant to Section VII, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

76. Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section VIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided in Section VIII (Dispute Resolution), the party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. <u>TERMINATION</u>

77. After Defendant has paid the civil penalty required by Section IV (Civil Penalty), completed the stabilization, restoration, and mitigation requirements of Section V (Injunctive Relief), and has complied with all other requirements of this Consent Decree, Defendant may serve upon the United States a Request for Termination, certifying that Defendant has satisfied those requirements, together with all necessary supporting documentation.

78. The Parties shall confer informally concerning Defendant's Request for Termination and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States, after consultation with ADEM, agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation or other appropriate document requesting termination of the Consent Decree.

79. If the United States, in consultation with ADEM, does not agree that the Consent Decree may be terminated, Defendant may invoke the procedures of Section VIII (Dispute Resolution). However, Defendant may not invoke such procedures until thirty (30) Days after service of its Request for Termination. If the United States or ADEM disputes that the criteria for termination has been met, this Consent Decree shall remain in effect pending resolution of the dispute by the Parties or the Court.

80. Irrespective of the preceding Paragraphs in this Section, termination of this Consent Decree does not extinguish Paragraphs 18 and 22 (permanent injunction) and does not alter the periods of time set forth in Section IX (Site Access and Information Collection and Retention).

## XIX. SIGNATORIES/SERVICE

81. Each undersigned representative of DOJ, ADEM, and Defendant certifies that such individual is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party such individual represents to this document.

82. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant need not file an answer to the Complaint unless or until the Court expressly declines to enter this Consent Decree.

## XX. INTEGRATION

83. This Consent Decree constitutes the entire agreement among the Parties regarding the subject matter of the Consent Decree and supersedes all prior representations, agreements, and understandings, whether oral or written, concerning the subject matter of the Consent Decree herein.

## XXI. 26 U.S.C. § 162(f)(2)(A)(ii) IDENTIFICATION

84. For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2), performance of Section V, or other provisions of the decree that impose injunctive obligations on defendants, including any requirements to apply for and obtain permits, is restitution, remediation, or required to come into compliance with law.

## XXII. FINAL JUDGMENT

85. Upon approval and entry of this Consent Decree by the Court, as recorded on the Court's docket, this Consent Decree shall constitute and have the force and effect of a final judgment of the Court as to the United States, ADEM, and Defendant.

## XXIII. APPENDICES

86. The following Appendices are attached to and part of this Consent Decree:

"Appendix 1" is the location map and aerial photograph of Poly Pit Site;

"Appendix 2" is the location map and aerial photograph of the Trace Pit Site;

"Appendix 3" is the Comprehensive Corrective Action Work Plan;

"Appendix 4" is Nationwide Permit 32, including Applicable Conditions

IT IS SO ORDERED.

Dated and entered this ____ day of __________, 20___.

______________________________
HON. EMILY C. MARKS
UNITED STATES DISTRICT JUDGE
Middle District of Alabama

FOR THE UNITED STATES OF AMERICA:

ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

10 November 2026
DATE

MARTHA MANN
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
P.O. BOX 7611
Washington, DC 20044-7611

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

11/9/26
DATE

SUZANNE RUBINI
ACTING REGIONAL COUNSEL
EPA REGION 4

11/4/26
DATE

CAROL DeMARCO KING
ACTING DIRECTOR
WATER ENFORCEMENT DIVISION
ENVIRONMENTAL PROTECTION AGENCY
OFFICE OF ENFORCEMENT AND COMPLIANCE
ASSURANCE

Of counsel:

PAUL SCHWARTZ
Associate Regional Counsel
United States Environmental Protection Agency,
Region 4 Atlanta, GA

MELISSA RAACK
Attorney-Advisor
United States Environmental Protection
Agency Office of Enforcement and
Compliance Assurance Washington, DC

FOR ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT:

Date: 11/4/26

ED POOLOS
Director
Alabama Department of Environmental Management
P.O. Box 301463
Montgomery, Alabama 36130-1463

Date: 11-4-2026

CARRIE BLANTON
Assistant Attorney General
Alabama Department of Environmental Management
Office of General Counsel
P.O. Box 301463
Montgomery, Alabama 36130-1463

FOR WIREGRASS CONSTRUCTION COMPANY, INC.:

11-8-26
Date

BRENT EARL WOOD
Authorized Agent for Wiregrass Construction Company
1830 Hartford Hwy, Dothan, AL 36301

# APPENDIX 1




APPENDIX 1, SHEET 1 of 2
WIREGRASS CONTRUCTION - POLY PIT
MACON COUNTY, ALABAMA




0 2,500 5,000 10,000 Feet

APPENDIX 1, SHEET 2 of 2 WIREGRASS CONTRUCTION - POLY PIT MACON COUNTY, ALABAMA

# APPENDIX 2




**APPENDIX 2, SHEET 1 of 2**
**WIREGRASS CONSTRUCTION - TRACE PIT**
**AUTAUGA COUNTY, ALABAMA**




**APPENDIX 2, SHEET 2 of 2**
**WIREGRASS CONSTRUCTION - TRACE PIT**
**AUTAUGA COUNTY, ALABAMA**

# APPENDIX 3

# COMPREHENSIVE CORRECTIVE ACTION WORK PLAN

## WIREGRASS CONSTRUCTION
## LAMBERT (POLY) PIT
## SHORTER, MACON COUNTY, ALABAMA
## &
## TRACE PIT
## DEATSVILLE, AUTAUGA COUNTY, ALABAMA

Submitted to:

Wiregrass Construction Company, Inc.
Attn: Steve VanDeventer
1342 Commercial Way
Montgomery, Alabama 36106

Prepared by:

TTL

&

5 SMOOTH STONES RESTORATION PLLC

Project No. 000210200423.25

June 4, 2025

# TABLE OF CONTENTS

**1.0 INTRODUCTION** ........ 1
**1.1 Background** ........ 1
**2.0 LAMBERT (POLY) PIT** ........ 3
**2.1 Stream and Stream Buffers** ........ 3
**2.1.1 Stream Restoration: Cubahatchee Creek** ........ 3
**2.1.2 Buffer Restoration, Enhancement, and Preservation: Cubahatchee Creek** ........ 4
**2.1.3 Bio-Swales and Tributaries** ........ 5
**2.2 Wetlands** ........ 7
**2.2.1 Filled Ponds: Wetlands Established by Fillings Existing Ponds** ........ 7
**2.2.2 Lowered Ponds: Wetlands Established by Lowering the Water Surface Elevation** ........ 8
**2.2.3 Perched Pond: Wetland Created Within a Perched Pond** ........ 9
**2.2.4 Wetland Preservation** ........ 10
**3.0 TRACE PIT** ........ 12
**3.1 Stream and Buffer Restoration and Preservation: UT-2** ........ 12
3.1.1 Baseline Information ........ 12
3.1.2 Design and Construction ........ 12
3.1.3 Credit Calculation ........ 12
**3.2 Stream Buffer: Mortar Creek** ........ 13
3.2.1 Baseline Information ........ 13
3.2.2 Design and Construction ........ 13
3.2.3 Credit Calculation ........ 13
**3.3 Stream Restoration: Berm Removal** ........ 14
3.3.1 Baseline Information ........ 14
3.3.2 Design and Construction ........ 14
3.3.3 Credit Calculation ........ 14
**3.4 Stream and Stream Buffer Restoration: UT-3** ........ 14
**3.5 Wetland Establishment: WEs – 1, WEs – 2 and WEs - 3** ........ 15
3.5.1 Baseline Information ........ 15
3.5.2 Design and Construction ........ 15
3.5.3 Credit Calculation ........ 15
**3.6 Wetland Enhancement: WEn – 1 and WEn – 2** ........ 16
3.6.1 Baseline Information ........ 16
3.6.2 Design and Construction ........ 16
3.6.3 Credit Calculation ........ 16
**3.7 Wetland Preservation: WP 1, 2, 3, 4 and 5** ........ 17
3.7.1 Baseline Information ........ 17
3.7.2 Preservation Design and Construction ........ 17
3.7.3 Credit Calculation ........ 17
**4.0 COMPARISON OF CREDITS TO REQUIREMENTS** ........ 18
**4.1 Credits Required** ........ 18
**4.2 Credits Generated** ........ 18

4.3 Summary ........ 18

**5.0 PROJECT SCHEDULE** ........ 20

**6.0 MONITORING PLAN AND PERFORMANCE STANDARDS** ........ 22

6.1 Wetlands ........ 22

*6.1.1 Wetland Hydrology Monitoring Plan* ........ 22

6.2 Streams ........ 24

*6.2.1 Channel Stability Monitoring and Performance Standards* ........ 24

*6.2.2 Stream Buffer Vegetation* ........ 25

*6.2.4 Stream Credits* ........ 26

*6.2.5 Stream Buffer Preservation* ........ 27

**7.0 ADAPTIVE MANAGEMENT AND MAINTENANCE** ........ 28

7.1 Adaptive Management ........ 28
7.1.1 Cubahatchee Creek, Tributaries and Bio-swales ........ 28
7.1.2 Wetlands ........ 28
7.1.3 Buffers ........ 29
7.1.4 Invasive Control ........ 29
7.1.5 Budget ........ 29

7.2 Maintenance ........ 30

**8.0 REPORTING** ........ 31

8.1 Reporting ........ 31

**9.0 COMPLIANCE ISSUES** ........ 32

9.1 Introduction ........ 32

9.2 Process Water ........ 32

9.3 Stormwater Management ........ 32

9.4 Schedule ........ 32

**10.0 REFERENCES** ........ 33

## FIGURES

Figure 1: Poly Pit Location and Topographic Map
Figure 2: Trace Pit Location and Topographic Map
Figure 3: Lambert Pit Site Mitigation Figure Map
Figure 4: Lambert Pit Site North Mitigation
Figure 5: Lambert Pit Site South Mitigation
Figure 6: Lambert Pit Site East Mitigation
Figure 7a: Lambert Pit Site Annual Bank Erosion
Figure 7b: Lambert Pit Site Annual Bank Erosion
Figure 8: Trace Pit Site Mitigation Figure Key Map
Figure 9: Trace Pit Site North Mitigation
Figure 10: Trace Pit Site Central Mitigation
Figure 11: Trace Pit Site South Mitigation
Figure 12: Lambert Pit Site Restrictive Covenant
Figure 13: Trace Pit Site Restrictive Covenant

## APPENDICES

Appendix A Aquatic Resource Impact Calculations
Appendix B Draft Design / Construction Drawings
Appendix C Credit Calculation Worksheets
Appendix D Planting Plan
Appendix E Wetland Restoration / Enhancement WRAP Analysis Reports
Appendix F Wetland and Riparian Buffer Mitigation Summary of Performance Standards

# 1.0 INTRODUCTION

## 1.1 Background

Wiregrass Construction Company, LLC (Wiregrass) began mining operations at the Lambert Pit in 2008. The center of the site is located at approximately latitude 32.404218 and longitude -85.980283. During 2017, Wiregrass purchased the Trace Pit Site for a materials processing operation. The center of the site is located near latitude 32.624000 and longitude -86.427594. Although some permits (notably, Section 402 water quality permits as issued by Alabama Department of Environmental Management and mining permits as issued by the Alabama Department of Labor) were obtained for these sites, there is no record that Section 404 permits, which would have authorized the placement of fill into federally jurisdictional waters of the United States, were ever obtained.

In 2020, the U.S. Environmental Protection Agency (EPA) became aware of unauthorized wetland impacts at the Poly Pit– particularly, for purposes of this Comprehensive Corrective Action Work Plan, those impacts are within an approximately 747.1-acre area located within Sections 4, 5, and 6, Township 16 North, Range 21 East, as well as Sections 31, 32 and 33, Township 17 North, Range 21 East as depicted on the U.S. Geological Survey (USGS) 7.5-minute Topographic Map of Shorter, Alabama (**Figure 1**). According to the USGS Topographic Map, the elevations at the site range from approximately 180 to 200 feet above mean sea level.

At the present time, Wiregrass conducts sand and gravel mining operations at the Lambert Pit and intends to continue to do so for the foreseeable future.

Wiregrass understands that specific impacts to the aquatic features at Lambert Pit have been quantified by the EPA to include approximately 141.57 acres of wetland impact and approximately 9,874 feet of stream impacts. An EPA provided figure identifying historically impacted aquatic features as well as calculations that quantify the functional loss and/or mitigation credits required of the impacts to aquatic resources are included in **Appendix A.** The following summarizes the impact calculations:

- 105.7 units of functional loss of wetland habitat
- 46,757.8 credits required to offset functional loss of stream habitat

Accordingly, Wiregrass retained TTL, Inc. (TTL) and 5 Smooth Stones Restoration PLLC to develop a Comprehensive Corrective Action Work Plan for the site to provide a level of mitigation for and restoration of previous impacts to the site's various aquatic features commensurate, as best as can be reasonably determined, to such impacts. This document is that plan which reflects the work and input of TTL and various subcontractors.

Due to the large scale of aquatic resources functional loss at Lambert Pit Site, the EPA has agreed to allow Wiregrass to consider restoration activities at Trace Pit Site as mitigation for impacts at the Lambert Pit Site. Trace Pit is approximately 500 acres. The center of the site is located near latitude 32.624000 and longitude -86.427594 within Sections 10, 13, 14, 15, and 24, Township 19 North,

Range 16 East, of the USGS Deatsville and Marbury 7.5 Minute Series Topographic Quadrangle Maps (**Figure 2**).

Mining activities at Trace Pit occurred prior to the Wiregrass acquisition of the property. The Trace Pit historically operated without a Section 404 permit and impacted Mortar Creek, its riparian wetland floodplain, and numerous unnamed tributaries.

A secondary objective of this document is to identify and detail prospective work on the sites intended to address compliance issues with NPDES Section 402 permits as issued by the Alabama Department of Environmental Management (ADEM) for both sites. Such work will also benefit the site's aquatic features (particularly Mortar and Cubahatchee Creeks and their unnamed tributaries). Much of the proposed work outlined in this document will take place in jurisdictional waters, therefore coordination with and approval from EPA is necessary. Furthermore, proposed activities intended to address Section 404 compliance issues may also warrant a modification and/or reissuance of the existing NPDES Section 402 permit. Both Section 404 and Section 402 proposed activities will also be coordinated with the required Mine Safety and Health Administration (MSHA) reclamation activities.

Wiregrass, TTL and 5SSR evaluated both the Lambert and the Trace Pit Sites for suitability of use as potential mitigation areas. The mitigation areas were selected based on site access and suitability of restoration practices, their proximity to the historic impacts, and their proximity to other areas onsite that may also require work related to the Wiregrass NPDES permit (Section 402). This will allow Wiregrass to mitigate for both issues in a more cost-effective manner. The mitigation areas are onsite and essentially located within or contiguous to the historic impact areas and will help replace lost functions of aquatic features. It should be noted after deliberation with EPA that a proximity factor is not applied to potential functional lift created at the Trace Pit Site that will be used to offset functional loss that occurred at the Lambert Pit Site.

# 2.0 LAMBERT (POLY) PIT

The work planned for the Lambert Pit Site (also known as the Poly Pit) includes restoration, enhancement and preservation of streams and buffers. Where appropriate, Wiregrass has added the 50-foot buffer required by ADEM to protect waters of the state from mining activities. The work also includes establishment and preservation of wetlands. **Figures 3 through 7** depicts the mitigation work proposed for the Lambert Pit Site.

## 2.1 Stream and Stream Buffers

The restoration work involving streams includes Cubahatchee Creek and numerous bio-swales and unnamed tributaries.

### *2.1.1 Stream Restoration: Cubahatchee Creek*

#### *2.1.1.1 Baseline Information*

Given that Cubahatchee Creek is actively eroding its banks, the USEPA expressed concern that it might erode the narrow strip of land separating it from Ponds L and K resulting in a violation of the Clean Water Act. In the early stages of the study, numerous alignments were proposed to reduce the risk of this happening.

Once 5SSR became involved, they decided to take a more quantitative approach to the issue. On Oct 23 -25, 2023, 5SSR staff visited the site and collected data to develop a BANCS Model (Rosgen, 1996) for Cubahatchee Creek on the Lambert Pit Site. To develop a BANCS Model, 5SSR divided the stream into short reaches and then determined a score for the Bank Erosion Hazard Index (BEHI) and the Near Bank Stress (NBS) to quantify the amount of sediment being produced by each reach. In **Figure 5**, the reaches that are eroding most quickly (identified by a yellow line) will be the stabilized as part of the mitigation efforts.

Based on the BANCS Model it is expected that the rate of erosion would be reduced by 70% over the current situation. Most importantly, it will significantly reduce erosion of the channel near Ponds L, K and O.

#### *2.1.1.2 Design and Construction*

Wiregrass developed a restoration plan that addressed the most serious problems. The plan calls for realignment of the two reaches showing the highest rates of erosion. The work will also involve adjustment to the profile and the installation of grade control structures within these reaches. The work also involves the establishment of a 200-foot buffer where space permits (Section 3.1.2). The design/construction drawings for Cubahatchee Creek are presented in Appendix B.

#### *2.1.1.3 Credit Calculations*

Table 1 shows the stream credits anticipated by restoring two reaches of Cubahatchee Creek. The USACE Mobile District (2012) Stream SOP In-Stream Worksheet credit calculations for restoration of Cubahatchee Creek are shown in Appendix C.

**Table 1: Stream Credits Anticipated by Restoring Portions of Cubahatchee Creek**

| Code | Length (feet) | Stream Credits |
|---|---|---|
| CC-SR1 | 1,192 | 8567.5 |
| CC-SR2 | 478 | 3435.6 |
| | **Total** | **12,003.1** |

### *2.1.2 Buffer Restoration, Enhancement, and Preservation: Cubahatchee Creek*

#### *2.1.2.1 Baseline Information*

The BANCS model showed that there are two reaches of Cubahatchee Creek that are unstable and in need of realignment. These reaches will require restoration of the associated buffer. In addition, the stability of most of the Creek could be improved by cutting a bankfull bench which will constitute buffer restoration. The restoration of the buffer and the creation of the bankfull bench will require grading from the back of the bench into the existing topography at a stable slope which will constitute buffer enhancement. There are also few reaches where no work on the buffer is planned and these reaches constitute buffer preservation.

#### *2.1.2.2 Design and Construction*

This portion of the project requires grading and planting. Planting will include livestakes, seeding of wetland and upland species, and planting of wetland and upland trees. The design/construction drawings for this work are presented in **Appendix B.**

#### *2.1.2.3 Credit Calculations*

Table 2 shows the stream credits that restoration, enhancement, and preservation of the Cubahatchee Creek buffer will yield 14,072 stream credits. The credit calculations for Cubahatchee Creek buffer are shown in **Appendix C.**

**Table 2: Stream Credits Anticipated by Restoring and Preserving Buffer on Cubahatchee Creek**

| Code | Length (feet) | Average Width (feet) | % Preservation | % Enhancement | % Restoration | Credits |
|---|---|---|---|---|---|---|
| CC – B1 | 265 | 261 | 100 | 0 | 0 | 174.9 |
| CC – B2 | 558 | 104 | 32 | 26 | 42 | 675.2 |
| CC – B3 | 566 | 176 | 100 | 0 | 0 | 404.7 |
| CC – B4 | 1623 | 98 | 0 | 48 | 52 | 2,231.6 |

| Code | Length (feet) | Average Width (feet) | % Preservation | % Enhancement | % Restoration | Credits |
|---|---|---|---|---|---|---|
| CC – B5 | 1559 | 137 | 35 | 28 | 37 | 2,915.3 |
| CC – B6 | 1193 | 141 | 5 | 59 | 36 | 2,230.9 |
| CC – B7 | 1139 | 138 | 3 | 61 | 36 | 2,129.9 |
| CC – B8 | 357 | 206 | 3 | 71 | 26 | 903.2 |
| CC – B9 | 284 | 73 | 3 | 35 | 62 | 390.5 |
| CC – B10 | 437 | 104 | 0 | 56 | 44 | 600.9 |
| CC – B11 | 534 | 131 | 34 | 25 | 41 | 910.5 |
| CC – B12 | 252 | 181 | 80 | 14 | 6 | 263.3 |
| CC – B13 | 274 | 207 | 93 | 2 | 5 | 241.1 |
| | | | | | **Total** | **14,072** |

### *2.1.3 Bio-Swales and Tributaries*

*2.1.3.1 Baseline Information*

During the development of the Lambert Site, a number of smaller watercourses were eliminated. In a PowerPoint Presentation given by USEPA on December 10, 2020, USEPA noted that two watercourses (named UT-C and UT-L) had been replaced by a series of ponds. This resulted in the loss of aquatic features and drainage within the Lambert Property. In addition, the proposed grading plan intended to help restore wetlands (see Section 3.2), will result in the further loss of topography and fairly large flat areas with poor drainage. As part of the overall restoration plan, Wiregrass decided to include a series of bio-swales and tributaries to facilitate drainage within the site and help maintain appropriate water levels in some of the wetlands. Because they are closely related, both the bioswales and tributaries will be presented together.

*2.1.3.2 Design and Construction*

While Wiregrass will not be seeking any stream credits for the bio-swales, they will serve an important function related to the restoration of the wetlands on site. The bio-swales are designed to flow past wetlands where a spillway structure will be installed at a specific elevation to allow water to flow from the bioswale into and/or out of the wetland. In this way the bio-swales will help maintain the desired water levels/hydrology in the wetlands. Other bio-swales are installed to act as an outlet at a specific elevation for a wetland. Table 3 shows the relationships between the bio-swales and the ponds.

**Table 3: Relationship between Bio-swales and Ponds/Wetlands**

| Bioswale | Ponds/Wetlands |
|---|---|
| 1 | I |
| | J |
| 2 | Unnamed Wetland |
| | K |

| Bioswale | Ponds/Wetlands |
|---|---|
| 3 | F |
| | K |
| 4 | N/A |
| 5 | O |
| 6 | P |
| 7 | Q |
| | P |
| 8 | R |
| 9 | N |

Where these bio-swales flow into Cubahatchee Creek, the design calls for the installation of grade control structures to manage the energy as the tributary flows down the slope associated with the bank of Cubahatchee. The grade control structures will also help prevent the bio-swales from cutting down through the sediment exposed when flows are low in Cubahatchee. The planting plan for the bio-swales involves application of the wetland seed mix (**Appendix D**). The design/construction drawings for the tributaries are shown in **Appendix B.**

*2.1.3.3 Tributaries*

The design calls for the construction of two unnamed tributaries. Tributary 1 begins at the confluence of bio-swales 1, 2 and 3 and is approximately 830 feet long. Tributary 7 comprises the downstream 438 feet of bio-swale 7. The flow in both tributaries is expected to be intermittent. Unlike the bio-swales which are generally featureless, the tributaries will have an appropriate pattern, dimension and profile like a natural watercourse. The design also calls for the installation of grade control structures within each reach. The planting plan for the tributaries includes application of the wetland seed mix and the installation of livestakes (Appendix D). The design/construction drawings for the tributaries are shown in **Appendix B.**

*2.1.3.4 Credit Calculations*

Because the bio-swales will have intermittent flow and do not have the form or function of a watercourse, Wiregrass will not be seeking any credit for these features.
The following table (Table 4) depicts the stream credits sought for the two unnamed tributaries. The 2012 Stream SOP calculation for the tributaries are shown in **Appendix C.**

**Table 4: Stream Credits Anticipated from the Restoration of Cubahatchee Creek Tributaries**

| Tributary | Length (feet) | Credits |
|---|---|---|
| 1 | 1105 | 6,188.0 |
| 7 | 417 | 2,335.2 |
| | **Total** | **8,523.2** |

## 2.2 Wetlands

Wiregrass intends to establish and preserve wetlands at the Lambert Site. The Lambert Site includes a large number of ponds which were created during the mining process. Wiregrass intends to use many of these ponds to help generate wetland credits. The ponds can be divided into 3 groups based on the approach used to create wetlands: filled ponds, lowered ponds and perched ponds. All present challenges because of a scarcity of topsoil.

Ponds L, M, C and D were originally considered for conversion to wetlands. However, Wiregrass determined that ponds L & M will be needed to manage stormwater from the adjacent plant. Once these were removed, ponds C & D were surrounded by the material sorting plant and its operations and connected to the other mitigation work by a very narrow strip of land, so Wiregrass decided to not try to convert them to wetlands.

### *2.2.1 Filled Ponds: Wetlands Established by Fillings Existing Ponds*

#### *2.2.1.1 Baseline Information*

Bathymetric surveys were carried out for most of the ponds on site. This section focuses on those ponds that were sufficiently shallow that portions of the ponds could be filled to create wetlands. This group includes Ponds H, F, K, O, P and Q.

#### *2.2.1.2 Design and Construction*

Wiregrass is planning to establish emergent wetlands in these ponds by filing them. Wiregrass plans to drain the pond down to the proposed water surface elevation (WSE) using the spillway and associated bio-swale. Then they will push material from the surrounding area into the ponds using a dozer to avoid double handling the material. In the process of doing this, the area of the pond/wetland will be increased beyond the footprint of the original pond. It should be noted that there is insufficient material onsite to completely fill each of the ponds resulting in some remaining open water in some of the ponds. The ponds will be filled with material to +/- 6 inches of the elevation of the spillway. There will be no systematic compaction of the material pushed into the ponds. Table 5 shows the existing WSE, the proposed WSE, the area of remaining open water and the area of wetland established for each pond. Given that the wetlands created will be extremely wet, Wiregrass is focusing on the establishment of emergent wetlands. As a result, the planting plan calls for the application of a wetland seed mix (**Appendix D**).

**Table 5: Wetlands Created by Filling Ponds**

| Pond | Area (acres) | Existing WSE | Proposed WSE | Difference in WSE | Open Water Area (acres) | Wetland Area (acres) |
|---|---|---|---|---|---|---|
| H | 9.2 | 188 | 183 | 5 | 3.0 | 6.1 |
| F | 8.6 | 187 | 182 | 5 | 1.4 | 7.1 |

| Pond | Area (acres) | Existing WSE | Proposed WSE | Difference in WSE | Open Water Area (acres) | Wetland Area (acres) |
|---|---|---|---|---|---|---|
| K | 21.4 | 186 | 180 | 6 | 8.1 | 13.3 |
| O | 14.3 | 178 | 176 | 2 | 4.5 | 9.8 |
| P | 22 | 183 | 179 | 4 | 6.9 | 15.1 |
| Q | 27.2 | 184 | 180 | 4 | 8.6 | 18.6 |

The design/construction drawings for the wetlands created by filling ponds are presented in **Appendix B.**

*2.2.1.3 Credit Calculations*

Table 6 shows the wetland credits anticipated by establishment of wetlands by filling ponds.

**Table 6: Wetland Credits Anticipated by Filling Ponds to Establish Wetlands.**

| Pond | Emergent Wetland Establishment (acres) | Wetland Credits |
|---|---|---|
| H | 6.1 | 2.318 |
| F | 7.1 | 2.698 |
| K | 13.3 | 5.054 |
| O | 9.8 | 3.724 |
| P | 15.1 | 5.738 |
| Q | 18.6 | 7.068 |
| | **Total** | **26.6** |

The spreadsheets showing the calculation of these credits are included in **Appendix E.**

### *2.2.2 Lowered Ponds: Wetlands Established by Lowering the Water Surface Elevation of Ponds*

*2.2.2.1 Baseline Information*

The bathymetric surveys carried out at Poly Pit indicated that several of the ponds (I, J and R) were deep and had steep side slopes below the water surface. While they had a narrow wetland around their periphery, they would require more material to fill to establish wetlands than was available on site.

*2.2.2.2 Design and Construction*

Wiregrass decided to establish emergent wetlands within these ponds by lowering the WSE by connecting the ponds to a bio-swale via a spillway. Wiregrass will expand the wetlands that already

existed around the periphery of these ponds. The proposed target elevation for the WSE of each pond was selected based on the elevation of the surrounding topography and the elevation that would maximize the wetland area based on the bathymetry of each pond (Table 7).

**Table 7: Wetlands Created by Lowering Ponds**

| Pond | Existing Area (acres) | Existing WSE | Proposed WSE | Difference in WSE | Open Water Area (acres) | Wetland Area (acres) |
|---|---|---|---|---|---|---|
| I | 9.9 | 188 | 180 | 8 | 8.9 | 1.0 |
| J | 7.4 | 188 | 180 | 8 | 6.9 | 0.5 |
| Un-named Wetland created at the Head of Bio-swale 3 | | 188 | 182 | 6 | 0 | 0.2 |
| R | 5.3 | 184 | 181 | 3 | 4.6 | 0.7 |

The planting plan calls to the application of a wetland seed mix (Appendix D). However, based on the existing wetlands there may be opportunities to use livestakes, particularly alder, to help vegetate these wetlands. The design/construction drawings for these wetlands are presented in Appendix B.

*2.2.2.3 Credit Calculations*

The establishment of the wetlands within the lowered ponds will potentially generate 0.912 wetland credits (see Table 8).

**Table 8: Wetland Credits Anticipated by Lowering the WSE of Existing Ponds**

| Pond | Establishment of Emergent Wetlands (acres) | Wetland Credits |
|---|---|---|
| I | 1.0 | 0.380 |
| J | 0.5 | 0.190 |
| Head of Bio-swale 3 | 0.2 | 0.076 |
| R | 0.7 | 0.266 |
| | **Total** | **0.912** |

The spreadsheets showing the calculation of these credits are included in **Appendix E.**

### *2.2.3 Perched Pond: Wetland Created Within a Perched Pond*

*2.2.3.1 Baseline Information*

Pond N is considered perched because a review of the WSE of these ponds indicates that they are not significantly influenced by groundwater. This pond was too shallow to do a bathymetric survey. In fact, Pond N already had some emergent vegetation growing in it. This is probably a function of the fact that the mine used it to treat their process water, resulting in significant deposits of fine material

on the bottom of the pond. As a result, the WSE in this pond is influenced more by precipitation than groundwater.

*2.2.3.2 Restoration Design and Construction*

Wiregrass decided to establish a wetland within this pond by lowering the WSE. Although bathymetric data was not available for this pond, the presence of emergent wetland species was used to help determine a target elevation. Water will be drained out of the wetland via a spillway connecting to a bio-swale.

**Table 9: Wetland Created within Perched Pond**

| Pond | Area (acres) | Existing WSE | Proposed WSE | Difference in WSE | Open Water | Wetland Area (acres) |
|---|---|---|---|---|---|---|
| N | 3.0 | 185 | 182 | 3 | 0 | 3.0 |

The planting plan for this wetland calls to the application of a wetland seed mix (**Appendix D**). The design/construction drawings for this wetland are presented in **Appendix B.**

*2.2.3.3 Credit Calculations*

Table 10 shows the wetland credits that are anticipated to be developed within the perched ponds.

**Table 10: Wetland Credits Anticipated to be Generated within the Perched Ponds**

| Pond | Establishment of Emergent Wetland (acres) | Wetland Credits |
|---|---|---|
| N | 3.0 | 1.14 |
| | **Total** | **1.14** |

The spreadsheets showing the calculation of these credits are included in **Appendix E.**

### *2.2.4 Wetland Preservation*

This section focuses on wetland preservation on the Lambert Property.

*2.2.4.1 Baseline Information*

Based on the WRAP analysis presented in **Appendix E** there are four wetland areas suitable for preservation (Figure 4). Table 11 identifies these WRAP Areas and the corresponding Wetland Preservation Areas.

**Table 11: WRAP Areas and Corresponding Preservation Areas**

| Wrap Area | Wetland Preservation Area |
|---|---|
| #4 & #5 | WP – 1 |
| #2 | WP – 2 |
| #3 | WP – 3 |
| #6 | WP – 4 |

WP – 1 is a 37.9-acre bottomland hardwood wetland located south of Ponds H, I and J. WP – 2 and WP – 3 are 4.4 and 2.5 acres, respectively, and located south of Ponds Q and T. WP – 4 is a 106-acre wetland located in northeast portion of the Lambert Pit Site. All four of these are bottomland hardwood wetlands that will be preserved as part of the mitigation measures undertaken at the Lambert Pit Site.

*2.2.4.2 Preservation Design and Construction*

Because this work involves preservation of the existing wetlands, no design or construction is anticipated.

*2.2.4.3 Credit Calculations*

Table 12 shows the wetland credits that are anticipated to be developed be preserving three existing bottomland hardwood wetland sites on the Lambert Site. The spreadsheets showing the calculation of these credits are included in **Appendix E**.

**Table 12: Wetland Credits Anticipated to be Generated by Preserving Wetlands**

| Wetland Preservation Site | Area (acres) | Wetland Credits |
|---|---|---|
| WP – 1 | 30.975 | 8.686 |
| WP – 2 | 2.496 | 0.794 |
| WP – 3 | 4.412 | 1.857 |
| WP – 4 | 106 | 26.818 |
| | **Total** | **38.155** |

# 3.0 TRACE PIT

The work planned for the Trace Pit includes the restoration, enhancement and preservation of streams and buffers. Where appropriate, Wiregrass has added the 50-foot buffer required by ADEM to protect waters of the state from mining activities. The work also includes enhancement and preservation of wetlands. **Figures 8 through 11** show the mitigation work proposed for the Trace Pit Site.

## 3.1 Stream and Buffer Restoration and Preservation: UT-2

The restoration work involving streams includes Mortar Creek and numerous unnamed tributaries.

*3.1.1 Baseline Information*

UT-2 presents opportunities for stream and buffer restoration and buffer preservation. Historically, UT-2 flowed in a southerly direction along the northern edge of the sorting plant. However, a road embankment and a culvert were installed many years ago. The culvert and road embankment have been in place long enough and restricted flows to the point that UT-2 has found a new flow path. The remnant channel still exists.

*3.1.2 Design and Construction*

The restoration plan involves the removal of the culvert and the road embankment and restore the natural flows within the remnant channel of UT-2 (approximate 1615 feet in length). As part of this work, Wiregrass will also restore 200 feet of buffer on the left bank of the Creek. This involves restoring stream buffer on land currently being used by the sorting plant. Wiregrass also intends on preserve approximately 2000 feet of undisturbed buffer on the left and right banks. Planting will include seeding of wetland and upland species and planting of wetland and upland trees. The design/construction drawings for UT-2 are presented in Appendix B.

*3.1.3 Credit Calculation*

Table 13 shows the stream credits that are anticipated to be developed by restoring flows in UT-2 and restoring 1000 feet of buffer that averages 150 feet in width and preserving 2000 feet of buffer that averages 150 feet in width.

**Table 13: Stream and Buffer Credits Anticipated to be Generated by UT-2**

| Type of Work | Length of Buffer (feet) | Average Buffer Width (feet) | Stream Credits |
|---|---|---|---|
| Restoring flows | 1615 | n/a | 3,157.33 |
| Restoring stream buffer (left bank of UT-2 B2) | 1000 | 150 | 2,255.00 |
| Preserving stream buffer (left and right bank of | 2000 | 150 | 1,100.00 |

| Type of Work | Length of Buffer (feet) | Average Buffer Width (feet) | Stream Credits |
|---|---|---|---|
| UT-2 B1 | | | |
| | | **Total** | **6,512.33** |

The spreadsheets showing the calculation of credits generated by UT-2 are included in **Appendix C.**

## 3.2 Stream Buffer: Mortar Creek

### *3.2.1 Baseline Information*

Mortar Creek flows in a northwest to southeast direction and extends the length of the Trace Pit Property. Mortar Creek avulsed many years ago and now flows in two separate channels. The newer channel which lies to the east of the original channel now conveys most of the flow. The two channels converge just north of where UT-2 joins Mortar Creek.

### *3.2.2 Design and Construction*

The buffer along Mortar Creek presents a number of opportunities for preservation and enhancement. The Mortar Creek buffer has been divided into a number of sections to allow for presentation of the information. The codes correspond to those used in Figure 8. The planting plan for these buffers includes the wetland seed mix and wetland trees in the floodplain and upland seed mix and upland trees in the higher areas. The design/construction drawings for the Mortar Creek Buffer work are presented in Appendix B. Since all the proposed work is enhancement, the only relevant plan sheet is the planting plan.

### *3.2.3 Credit Calculation*

Table 14 shows the stream buffer credits that are anticipated to be generated by Mortar Creek Buffer work.

**Table 14: Stream Credits Anticipated to be Generated by Mortar Creek Buffer Work**

| Code | Length (feet) | Average Width (feet) | % Preservation | % Enhancement | Credits |
|---|---|---|---|---|---|
| MC – B1 | 700 | 200 | 100 | 0 | 462 |
| MC – B2 | 1,050 | 200 | 85 | 15 | 1,617.0 |
| MC – B3 | 2,000 | 200 | 95 | 5 | 1,760.0 |
| MC – B4 | 1,250 | 150 | 80 | 20 | 1,512.5 |
| MC – B5 | 1,200 | 150 | 100 | 0 | 858.0 |
| MC – B6 | 2,525 | 200 | 95 | 5 | 2,539.4 |
| MC – B7 | 1,150 | 100 | 80 | 20 | 1,012.0 |
| MC – B8 | 450 | 200 | 100 | 0 | 396.0 |
| | | | | **Total** | **10,156.9** |

The spreadsheets showing the calculation of credits generated by proposed work on the Mortar Creek Buffer are included in **Appendix C.**

## 3.3 Stream Restoration: Berm Removal

### *3.3.1 Baseline Information*

Just downstream of the confluence with UT – 2, it appears that there was a crossing located on Mortar Creek. While the crossing is no longer used, a remnant berm still projects southward from the sorting plant almost to the left bank of Mortar Creek. The berm significantly restricts Mortar Creek's access to its floodplain. Removal of the berm will help restore proper function to Mortar Creek and it's associated floodplain.

### *3.3.2 Design and Construction*

The design and construction for the berm removal is quite simple. The berm will be excavated down to natural grade with the removed material deposited at the back of the floodplain. The planting plan for the berm removal includes the wetland seed mix and wetland trees in the floodplain and possibly the upland seed mix and upland trees in the higher areas. The design/construction drawings for the berm removal are presented in Appendix B.

### *3.3.3 Credit Calculation*

Table 15 shows the stream buffer credits that are anticipated to be generated by Mortar Creek Berm Removal work.

**Table 15: Credits Anticipated to be Generated by Mortar Creek Berm Removal Work**

| Activity | Credits Generated |
|---|---|
| Removal of berm | 604.8 |

## 3.4 Stream and Stream Buffer Restoration: UT-3

It should be noted that while UT-3 will probably develop a natural channel through the wetlands established by lowering Ponds 2 and 4, this will take many years to occur and will not have developed in the three years of post-construction monitoring. For this reason, Wiregrass will not be seeking credit for instream restoration.

In addition, as part of the work on Ponds 2 and 4 to create wetlands, Wiregrass intends to remove the NPDES outfall and dam which currently manages water levels in Pond 4. The dam will be replaced by a series of step pools which will improve the connectivity of UT-3 upstream through wetlands 2 and 4. Wiregrass will not be seeking credit for stream buffer restoration.

## 3.5 Wetland Establishment: WEs – 1, WEs – 2 and WEs - 3

### *3.5.1 Baseline Information*

The Trace Pit Site includes several ponds which can be converted to wetland. Ponds 2, 3 and 4 located near the central portion of the Trace Pit Site were established to manage mine process water. All have their elevations controlled by earthen structures. Ponds 2 and 4 are the oldest. Pond 3 was used most recently and, as a result, it still has a lot of unconsolidated material present. Wiregrass intends to lower these both ponds and convert them to bottomland hardwood wetlands.

### *3.5.2 Design and Construction*

Wiregrass intends to remove the road embankment and culvert at the outlet of Pond 2 and replace them with a ford crossing. The ford crossing will be designed to lower the water surface elevation of Pond 2 by 4.5 feet and create (WEs – 1). Once the water has been lowered, Wiregrass will plant this with the wetland seed mix and wetland trees (i.e., bottomland hardwood species) **(Appendix D).**

Pond 3 will be lowered by breaching the internal and external berms and allowing it to equilibrate with Pond 2. Because Pond 2 is the youngest pond with a lot of fine sediment, Wiregrass proposes to establish an Emergent Wetland (WEs - 2) using a wetland seed mix (**Appendix D**). Depending on the conditions when the water surface has been lowered it may be possible to livestake it.

In Pond 4, Wiregrass plans on removing the berm and the NPDES discharge pipe and lowering the water surface elevation by about 3 feet to establish a Bottomland Hardwood Wetland (WEs – 3). The berm and pipe will be replaced with a series of step-pools to transition the water into UT-3 just before it flows into Mortar Creek. The planting plan will include wetland seed mix, livestakes and wetland trees (**Appendix D**). The design/construction drawings for WEs -1, WEs – 2, and WEs – 3 are presented in **Appendix B.**

### *3.5.3 Credit Calculation*

Table 16 shows the wetland credits that are anticipated to be generated by replacing Pond 2 (WEs – 1), Pond 3 (WEs – 2) and Pond 4 (WEs – 3) with wetlands.

**Table 16: Wetland Credits Anticipated to be Generated by Replacing Ponds 2, 3 and 4 with Wetlands**

| Site | Type | Area (acres) | Wetland Credits |
|---|---|---|---|
| WEs – 1 | Establishment - Bottomland Hardwood | 12.26 | 4.769 |
| WEs – 2 | Establishment - Emergent | 10.55 | 4.009 |
| WEs – 3 | Establishment - Bottomland Hardwood | 25.418 | 9.888 |
| | | **Total** | **18.666** |

The spreadsheets showing the calculation of credits generated by converting Ponds 2, 3 and 4 to wetlands are presented in **Appendix E.**

## 3.6 Wetland Enhancement: WEn – 1 and WEn – 2

*3.6.1 Baseline Information*

There are two areas of wetland enhancement on the Trace Pit Site and they are located west of UT-2. Both areas regularly flood and have wetland hydrology, but they lack suitable vegetation. Together, these areas represent approximately 2.8 acres of potential wetland enhancement.

*3.6.2 Design and Construction*

The work within WEn – 1 and WEn – 2 is focused on getting appropriate vegetation established on these two sites. The planting plan calls for the application of the wetland seed mix (Appendix D) to hasten the creation of an Emergent Wetland. If conditions are appropriate, livestakes will also be installed. The design/construction drawings for Wetland Enhancement - 1 are presented in **Appendix B.**

*3.6.3 Credit Calculation*

Table 17 shows the wetland credits that are anticipated to be developed be enhancing two sites that have wetland hydrology but lack suitable vegetation.

**Table 17: Wetland Credits Anticipated to be Generated through Wetland Enhancement**

| Wetland Site | Type | Area (acres) | Wetland Credits |
|---|---|---|---|
| WEn - 1 | Enhancement – Emergent | 2.5 | 0.073 |
| WEn - 2 | Enhancement - Emergent | 0.3 | 0.009 |
| | | **Total** | **0.082** |

The spreadsheets showing the calculation of credits that are anticipated to be generated by WEn – 1 and WEn – 2 are presented in **Appendix E.**

## 3.7 Wetland Preservation: WP 1, 2, 3, 4 and 5

### *3.7.1 Baseline Information*

Based on the WRAP analysis presented in **Appendix E**, there are five areas suitable for preservation on the Trace Pit Site. Table 18 identifies these WRAP Areas and the corresponding Wetland Preservation Area in the CCAWP.

**Table 18: WRAP Areas and Corresponding Preservation Areas**

| WRAP Area | Wetland Preservation Area |
|---|---|
| #1 | WP – 5 |
| Corridor #1 | WP – 4 |
| Corridor #2 | WP – 3 |
| #7 | WP – 2 |
| #8 | WP – 1 |

### *3.7.2 Preservation Design and Construction*

Because this work involves preservation of the existing wetlands, no design or construction is anticipated.

### *3.7.3 Credit Calculation*

Table 19 shows the wetland credits that are anticipated to be developed be preserving three existing bottomland hardwood wetland sites on the Trace Pit Site.

**Table 19: Wetland Credits Anticipated to be Generated by Preserving Wetlands**

| Wetland Preservation Site | Area (acres) | Wetland Credits |
|---|---|---|
| WP – 1 | 3.1 | 1.45 |
| WP – 2 | 1.1 | 0.559 |
| WP – 3 | 19.9 | 8.860 |
| WP – 4 | 23.3 | 10.582 |
| WP – 5 | 24.1 | 11.401 |
| | **Total** | **32.852** |

The spreadsheets showing the calculation of credits that are anticipated to be generated by WP - 1, WP - 2, WP – 3, WP – 4 and WP - 5 are included in **Appendix E.**

# 4.0 COMPARISON OF CREDITS TO REQUIREMENTS

This section of the report summarizes the credits that will be generated by the CCAWP and compares them to the requirements.

## 4.1 Credits Required

Based on the calculations presented in Section 1.0, Wiregrass needs to generate the following credits to offset the impacts at the Lambert Pit Site:

- 105.7 wetland habitat credits
- 46,757.8 stream habitat credits

## 4.2 Credits Generated

The following Table presents the credits that are anticipated to be created by the activities proposed in the CCAWP.

**Table 20: Summary of Credits to be Generated by the Lambert and Trace Mitigation Plan**

| Site | Activity | Stream Credits | Wetland Credits |
|---|---|---|---|
| Lambert | Stream Restoration | 12,003.125 | n/a |
| Lambert | Stream Buffer Restoration, Enhancement and Preservation | 14,072 | n/a |
| Lambert | Tributaries | 8,523.2 | n/a |
| Lambert | Wetland Establishment – Filling Ponds | n/a | 26.6 |
| Lambert | Wetland Establishment – Lowering Water Levels | n/a | 0.912 |
| Lambert | Wetland Establishment – Perched Ponds | n/a | 1.14 |
| Lambert | Wetland Preservation | n/a | 38.155 |
| Trace | UT – 2 | 6,512.33 | n/a |
| Trace | Mortar Creek Buffer | 10,156.9 | n/a |
| Trace | Berm Removal | 604.8 | n/a |
| Trace | Wetland Establishment | n/a | 18.666 |
| Trace | Wetland Enhancement | n/a | 0.082 |
| Trace | Wetland Preservation | n/a | 32.852 |
| | **Total** | **51,872.4** | **118.325** |

## 4.3 Summary

Table 20 shows that if all the stream work proposed for the Lambert and Trace Pit Sites is successful then Wiregrass will produce 51,872.4 stream credits against a target of 46,757.8 – approximately 11% more than required. This means that Wiregrass could produce 11% fewer stream credits than

planned and still meet their target. If all the stream mitigation work is successful, then Wiregrass will create about 12% more credits than required. Similarly, Table 20 shows that if all of the wetland work proposed for the Lambert and Trace Pit Sites is successful then Wiregrass will produce 118.325 wetland credits against a target of 105.7 – approximately 12% more than required. This means that Wiregrass could produce 12% fewer wetland credits than planned and still meet their target.

USEPA has also indicated that if Wiregrass is diligent in its efforts to meet the requirements but fails to create sufficient credits at the end of the 5-year post-construction monitoring period, that it has the option of purchasing credits from an approved mitigation bank to make up the shortfall.

# 5.0 PROJECT SCHEDULE

There are several factors which were considered when developing the schedule for this project. The first is the Consent Order. Wiregrass will not begin any construction work until they have signed the Consent Order which clearly spells out what work is to be undertaken, the performance criteria for this work and the schedule for implementation.

The second is the plan to design and implement an invasive control program prior to doing any grading in support of wetland establishment. Depending on when the consent order is signed, and the need to carry out an invasive program during the growing season Wiregrass may need six months to address the invasive issue before construction can begin.

The third factor relates to the availability of a suitable stream restoration contractor. While Wiregrass has the ability to undertake much of the wetland work themselves, they intend to use a specialist contractor to do the stream restoration work. These contractors tend to book up early and so a design needs to be completed about six months before construction so that Wiregrass has time to obtain bids and get a contract in place.

The fourth factor relates to the season when work can be carried out. Given that almost all parts of the project require seeding/planting, these portions of the project must be completed during the winter so that the vegetation can get established before the hot summer weather.

The fifth factor relates to the need for Wiregrass to obtain a revised NPDES Permit (see Section 9.0). ADEM which handles NPDES Permitting is backlogged with some permit revisions taking a year to issue.

The following draft schedule for the project takes these five factors into account:

**Table 21: Project Draft Schedule**

| Month | Event |
|---|---|
| 0 | Effective Date of the Consent Decree |
| | |
| 36 | Work on wetlands complete |
| 36 | Work on streams complete |
| 36 | As-built complete |
| 48 | Submit Year 1 Monitoring Report |
| 54 | Design and implement any necessary remedial measures |
| 60 | Submit Year 2 Monitoring Report |
| 66 | Design and implement any necessary remedial measures |
| 72 | Submit Year 3 Monitoring Report |
| 78 | Design and implement any necessary remedial measures |
| 84 | Submit Year 4 Monitoring Report |

| | |
|---|---|
| 90 | Design and implement any necessary remedial measures |
| 96 | Submit Year 5 Monitoring Report |

# 6.0 MONITORING PLAN AND PERFORMANCE STANDARDS

This section of the report is based on the understanding that the Consent Order that will ultimately be signed will include a Force Majeure clause. This section is organized into two major sections: wetland and streams. For each section, a monitoring plan and performance standards are provided.

## 6.1 Wetlands

### *6.1.1 Wetland Hydrology Monitoring Plan*

Wetland hydrology will be monitored using groundwater wells. The number and installation of the monitoring wells to be used and the monitoring protocols will be determined using the guidance documents published by the Wetlands Regulatory Assistance Program (ERDC TN-WRAP-00-02, 05-02 and 06-02). The locations will be chosen to ensure that they are representative. For example, at the Lambert Pit Site, there will be at least one well installed in each of the three major types of wetlands (i.e., wetlands created by filling ponds; wetlands created by lowering the water surface elevation of ponds; and wetlands created within perched ponds). Where possible, the wells will be co-located with a vegetation plot. However, care will be taken to ensure that accessing and collecting the data from the well does not damage the planted vegetation. Given that most of the wetland establishment at both the Lambert and Trace Pit Sites, involve adjustments to the water surface elevations, it was decided to wait until this work had been completed before specifying the precise locations of the wells. Wiregrass will provide an as-built survey following completion of all site work that clearly identifies the location of all proposed monitoring locations.  Success monitoring shall not be implemented until USEPA reviews and approves the final location of monitoring plots. Tables 22 and 23 specifies the number of wells and vegetation plots (fixed and random) for the Lambert Pit and Trace Pit Sites respectively.

**Table 22: Wells and Vegetation Plots for Wetlands at the Lambert Pit Site**

| Pond/Wetland | Wetland Area (acres) | Number of Wells | Number of Fixed Veg Plots | Number of Random Veg Plots |
|---|---|---|---|---|
| Filled Wetlands | | | | |
| H | 6.1 | 1 | 1 | 0 |
| F | 7.1 | 1 | 1 | 0 |
| K | 13.3 | 1 | 2 | 1 |
| P | 15.1 | 1 | 2 | 1 |
| Q | 18.6 | 1 | 2 | 1 |
| Lowered Wetlands | | | | |
| I | 1.0 | 1 | 1 | 0 |
| J | 0.5 | 0 | 0 | 0 |
| Unnamed | 0.2 | 0 | 0 | 0 |
| R | 0.7 | 1 | 1 | 0 |
| Perched Wetlands | | | | |
| N | 3.0 | 1 | 1 | 0 |

**Table 23: Wells and Vegetation Plots for Wetlands at the Trace Pit Site**

| Wetland | Wetland Area (acres) | Number of Wells | Number of Fixed Veg Plots | Number of Random Veg Plots |
|---|---|---|---|---|
| WEs – 1 | 12.3 | 1 | 2 | 0 |
| WEs – 2 | 10.6 | 1 | 2 | 0 |
| WEs – 3 | 25.4 | 1 | 3 | 2 |
| WEn – 1 | 2.5 | 1 | 1 | 1 |
| WEn – 2 | 0.3 | 0 | 0 | 0 |

*6.1.1.1 Wetlands Hydrology Performance Standard*

The wetlands will be deemed to be meeting the hydrology requirement if water is within 12 inches of the ground surface for 14 consecutive days or 12.5% of the growing season. According to information obtained from the NRCS WETS station for Milstead, AL (Macon County) (https://agacis.rcc-acis.org/), the growing season extends between March 3 and November 23 (265 days annually based upon the 1981 – 2010 data record.

### *6.1.2 Wetland Vegetative Monitoring Plan*

Immediately after construction, the monitor will establish in random locations sampling quadrat(s) with a density of approximately 1 sampling quadrat per 5 acres of planting. Where possible, the vegetation sampling quadrats will be co-located with the groundwater monitoring wells. Each quadrat will be 1/10 acre in size with any shape being acceptable (e.g., square, rectangle, circle). Each quadrat will be staked and its GPS coordinates noted so that it can be located in subsequent years. Within each quadrat, the monitor will evaluate vegetation present (tree counts, etc.) and percent species composition. All vegetation monitoring will be carried out during the growing season. In recognition of the fact that some of the sites may not be safe to assess on foot, Wiregrass will consider the use of a drone to assess vegetative cover. Should use of a drone be deemed necessary, Wiregrass will provide additional information to USEPA to review and approve prior to the monitoring period. Wiregrass will collect supplementary data (species composition, coverage, etc.) to accompany drone-based data during monitoring activities. A detailed summary of the wetland and riparian buffer mitigation performance standards is provided in **Appendix F**.

Tables 22 and 23 outline the vegetation monitoring strategy for the Lambert and Trace Wetlands, respectively.

*6.1.2.1 Wetlands Vegetative Performance Standard*

The performance standards depend on the type of wetland restoration being proposed. Many of the wetlands being proposed for the Lambert Pit Site are Emergent. This is a result of the fact that many of the wetlands will be created from open water ponds. This coupled with a shortage of topsoil on the site will create challenges for vegetation establishment. For this reason, Wiregrass is proposing that the vegetation target for the sites where we are proposing Emergent Wetlands be 75 percent

vegetative coverage with less than 5 percent of the vegetative coverage being invasives at the end of five years. Where there is more than one sampling quadrat for a given wetland, the results of all the sampling quadrats will be averaged. Additionally, Wiregrass will complete the *Wetland Determination Data Forms – Atlantic and Fuld Coastal Plain Region* (2010) which includes the wetland vegetation and associated prevalence test.

While Emergent wetlands are proposed at the Lambert Pit Site, Wiregrass is proposing the establishment of Forested wetlands (i.e., Bottomland Hardwood wetlands) for some areas within the Trace Pit Site. For the wetlands where woody stems will be planted, Wiregrass is proposing a target of 150 stems/acre at the end of 5 years of monitoring. Where there is more than one sampling quadrat for a given wetland, the results of all the sampling quadrats will be averaged.

The combined results of the quadrats should show a survivorship of 150 stems per acre in Year 5. In addition, planted trees must triple in height and root collar diameter by Year 5. Volunteer trees can be counted provided they are native to the area. Invasive species must represent less than 5% of the trees present. Additionally, the quadrats should have representation of a minimum of 5 different woody species from the target list.

For the wetlands being preserved, there is no monitoring proposed, other than an annual visit to ensure that the wetland is functioning and has not experienced a significant perturbation (i.e., timber activity, fire).

#### *6.1.3 Wetland Credits*

In total, Wiregrass must produce 105.7 wetland credits at the end of the 5-year monitoring plan in order to be deemed a success by USEPA. The number of wetland credits is a function of the several factors including the type of wetland restored (e.g., Emergent, Forested), the restored wetlands meeting the hydrologic and the vegetation success criteria (articulated in sections 6.1.1.1 and 6.1.2.1, respectively) and the area of wetlands actually restored. It is recognized that some wetland restoration efforts may produce more acres than originally anticipated while others may produce fewer. For reasons of safety, Wiregrass proposes to monitor the area of wetland produced using aerial imagery (drone or satellite). The imagery will be used to calculate the acres of wetland restored.

## 6.2 Streams

### *6.2.1 Channel Stability Monitoring and Performance Standards*

Wiregrass reviewed the USACE Mobile District's Guidance for Development of Stream Mitigation Performance Standards available on the USACE RIBITS online portal (https://ribits.ops.usace.army.mil/ords/f?p=107:2:12306499269457::NO::) (US Government, 2023) to guide the development of the post-construction monitoring plan, including metrics to determine success, for the newly created stream channels. However, the guidance document did not provide usable metrics. For this reason, Wiregrass decided to adapt the guidance produced by the

USACE Wilmington District (US Army Corps of Engineers, 2016), a district with considerable experience in stream restoration. The following presents summaries of sections of this guidance. The original document should be reviewed before implementation of the post-construction monitoring.

The stability of the restored (Cubahatchee) or created (tributaries) channels will be monitored using both quantitative and qualitative methods. A longitudinal profile of the thalweg, water surface, bankfull and top of bank must be collected during the as-built survey of the constructed channel to compare with future geomorphological data. Additional longitudinal profiles are not required during routine channel stability monitoring (years 1 through 5) unless the monitoring efforts demonstrate channel bank or bed instability, in which case additional longitudinal profiles may be required along channel reaches of concern to track changes in the channel and demonstrate stability.

Permanent, monumented cross-sections must be installed at riffles on an approximate frequency of one per 20 bankfull widths measured along the centerline of the channel. All channel cross-sections must include measurements of BHR and ER. Bank-height ratio (BHR) must not exceed 1.2 at any measured riffle cross-section. The entrenchment ratio (ER) must be no less than 1.4 at any measured riffle cross-section. The BHR and ER at any measured riffle cross-section should not change by more than 10% from the baseline conditions during any given monitoring interval (e.g., not that 10% between years 1 and 2, 2 and 3, or 3 and 5).

In addition to the survey, a visual assessment of the channel stability will be carried out by walking the entire length of Cubahatchee Creek, including those portions of the Creek where no channel work was done, the tributaries and the bioswales. The assessment will identify areas of erosion that could represent a threat to the stability of the watercourse and/or the project. These areas will be GPS'd, photographed and measured. For each site, the assessor will indicate whether it should be repaired or simply monitored in subsequent years.

A professional with experience in stream restoration and channel stability will be responsible for interpreting the stream channel monitoring data and visual assessment and recommending remedial measures, if necessary.

### *6.2.2 Stream Buffer Vegetation*

For buffers where the planting of woody specimens will occur, Wiregrass is proposing the same sampling procedure and performance standards as that proposed for wetlands (see section 7.1.2) where woody specimens will be planted. This means that there will be one sampling quadrat that is 1/10 of an acre in size per 5 acres of planted buffer and that the same performance standards apply (i.e., 150 stems/acre with the height and the root collar diameter tripling at the end of year 5. Tables 24 and 25 present the plan for buffer vegetation monitoring at the Lambert and Poly Pit Sites respectively.

**Table 24: Stream Buffer Vegetation Monitoring for Lambert Pit Site**

| Code | Enhancement / Restoration Area (acres) | Number of Fixed Veg Plots |
|---|---|---|
| CC - B1 | 0 | 0 |

| Code | Enhancement / Restoration Area (acres) | Number of Fixed Veg Plots |
|---|---|---|
| CC - B2 | 1.3 | 0 |
| CC– B3 | 0 | 0 |
| CC – B4 | 3.7 | 1 |
| CC – B5 | 4.9 | 1 |
| CC – B6 | 3.9 | 1 |
| CC – B7 | 3.6 | 1 |
| CC – B8 | 1.7 | 1 |
| CC – B9 | 0.5 | 0 |
| CC – B10 | 1.0 | 0 |
| CC – B11 | 1.6 | 1 |
| CC – B12 | 1.0 | 0 |
| CC – B13 | 1.3 | 0 |

**Table 25: Stream Buffer Vegetation Monitoring for Trace Pit Site**

| Code | Enhancement / Restoration Area (acres) | Number of Fixed Veg Plots |
|---|---|---|
| MC – B1 | 0 | 0 |
| MC – B2 | 0.7 | 1 |
| MC – B3 | 0.5 | 0 |
| MC – B4 | 0.9 | 1 |
| MC – B5 | 0 | 0 |
| MC – B6 | 0.1 | 0 |
| MC – B7 | 0.5 | 0 |
| MC – B8 | 0 | 0 |
| UT – 2 B1 | 0 | 0 |
| UT – 2 B2 | 4.6 | 1 |

### *6.2.4 Stream Credits*

In total, Wiregrass must produce 46,757.8 stream credits at the end of the 5-year monitoring plan in order to be deemed a success by USEPA. Wiregrass plans on generating stream credits by restoring portions of Cubahatchee Creek, restoring numerous tributaries to Cubahatchee Creek and restoring, enhancing and preserving stream buffers. Stream credits are a function of the several factors including the geomorphic characteristics of the restored stream and the areas of buffer restored and/or enhanced. The success criteria for geomorphology of the channels and the vegetation in the buffer (articulated in Sections 6.2.1 and 6.2.2 respectively). Wiregrass proposes to monitor the

length of successfully restored stream and the area of buffer restored/enhanced using GPS equipment.

### *6.2.5 Stream Buffer Preservation*

There are no performance standards for the preservation sites. Wiregrass proposes to inspect each preservation site once per year, either on foot, or using a drone. The inspection will focus on ensuring that the sites are undisturbed.

# 7.0 ADAPTIVE MANAGEMENT AND MAINTENANCE

## 7.1 Adaptive Management

As with any environmental restoration project, Wiregrass anticipates that it will be necessary to undertake some adaptive management to meet the project goals. This section outlines some of the adaptive management techniques that may be considered for the channel, buffer and wetland aspects of the project.

### *7.1.1 Cubahatchee Creek, Tributaries and Bio-swales*

Wiregrass plans to reduce the need for adaptive management with respect to channels by using a contractor with a significant amount of experience to undertake the stream work.

Adaptive management will be considered for each channel on an as-needed basis depending on the issue but the following is a list of strategies that could be considered:

- Replanting
- Regrading
- Repairing/installing new bank protection structures
- Repairing/installing new grade control structures

As noted previously, a stream restoration professional will collect and analyse the data in the Annual Monitoring Reports and make a professional judgement as to whether remedial action is necessary to ensure long-term stability. Experience has shown that it is best to not overreact to minor erosion issues, especially in the first few years when a new channel tends to make some minor adjustments. Minor erosion issues tend to heal themselves. When deciding as to whether adaptive management on the channel is needed, the specialist must weigh the need for remedial work on the channel against the associated damage to planted vegetation when accessing the site.

### *7.1.2 Wetlands*

Adaptive management will be considered for each wetland on an as-needed basis depending on the issue. If the issue is meeting the vegetation targets, the following is a list of strategies that could be considered:

- Replanting
- Changing the species mix
- Controlled burning
- Invasive Control

If the issue is meeting the hydrology requirements, the following is a list of strategies that could be considered:

- Regrading

- Adjusting the elevation of the spillway
- Beaver management

Wiregrass recognizes that beavers are a natural part of the regional ecosystem, and they are capable of providing various ecosystem functions. Wiregrass will consult with EPA prior to conducting beaver management (i.e., dam removal). If beavers do construct dams which in-turn, alter the target hydrology, EPA understands that success criteria may not be achieved (e.g., tree survivorship). In these instances, modifications to established success criteria may be necessary if the beaver activity is determined to be desirable. The Annual Monitoring Report, which will contain recommendations for adaptive management activities, such as beaver management will provide a basis for discussion of such activities.

In addition to using adaptive management to help the wetlands meet their performance standards and generate the required number of credits, Wiregrass intends to seize opportunities to improve the quality and value of the mitigation work. For example, Wiregrass is targeting Emergent Wetlands for most of the ponds on the Lambert Pit Site. However, after the water surface elevation has been lowered, it is possible that some of the ponds may contain more topsoil than anticipated and therefore may support a forested wetland. If this is the case, then Wiregrass will plant woody stems and, if successful, increase the number of credits generated from during the conversion of the pond to a wetland.

#### *7.1.3 Buffers*

Buffer work involves both grading and planting. For this reason, the adaptive management strategies for buffers are pretty much the same as those for the wetlands.

#### *7.1.4 Invasive Control*

Invasive species are present at both the Lambert and Trace Pit Sites. At the Lambert Pit Site, cogon grass, Chinese tallow and Chinese privet are commonly found, while at the Trace Pit Site, Chinese tallow and Chinese privet are commonly found. Wiregrass recognizes that these invasives will make it difficult to meet the performance standard for vegetation that states that no more than 5% of the vegetation present on any restoration site can be invasive species. Wiregrass is particularly concerned about cogon grass along the Cubahatchee Creek corridor at the Lambert Pit Site. Wiregrass is concerned that the large-scale grading planned for the Lambert Pit Site, could lead to redistribution of cogon grass across the site. For this reason, Wiregrass plans to develop a better understanding of the current distribution of invasives, the risk of spreading them during construction and then develop a plan to manage these invasives prior to construction and during the 5-year post-construction monitoring period.

#### *7.1.5 Budget*

Given the extent of the work proposed at the Lambert and Trace Pit Sites and the issues associated with invasive species and an absence of topsoil, Wiregrass intends to set aside 25% of the original construction cost to pay for adaptive management activities.

## 7.2 Maintenance

Wiregrass proposes to protect the mitigation activities undertaken at the Lambert and Trace Pit Sites in perpetuity by placing a restrictive covenant on the title to the property. Wiregrass is prepared to use the Mobile District's template.

It should be noted that Wiregrass is not planning on placing a restrictive covenant on the entire Lambert or Trace Properties. There are significant portions of both properties that are not affected by mitigation activities. Wiregrass would like to keep their options open with respect to stockpiling, sorting and processing activities on both sites.

Figures 12 and 13 show the proposed extent of the restrictive covenantsthat Wiregrass is prepared to place on the Lambert and Trace Pit Sites, respectively.

# 8.0 REPORTING AND DELIVERABLES

## 8.1 Reporting

Wiregrass proposes to carry out monitoring beginning in Year 0 (as-built) and continue monitoring until the end of Year 5. Wiregrass understands that it may request a release/reduction from monitoring upon meeting the established criteria for two consecutive years. Wiregrass further understands that it would still be required to conduct a final Year 5 monitoring event that evaluates the long success of the proposed activities. If the restoration work is on track to meet all the performance metrics, Wiregrass may skip the Year 4 monitoring, with the understanding that it must monitor in Year 5 to demonstrate the long-term success of the restoration work.

Field data will be gathered as specified in Section 7 Performance Standards and Monitoring Plan. Data will be compiled and then presented, including comparisons across years for both wetlands and channel stability. The report will also include recommendations for adaptive management (e.g., replanting, grading, invasive control, etc.). Where adaptive management is recommended, the results will be documented and included in the next year's report. All monitoring reports are to be submitted to USEPA by December 31 of each year in which monitoring is to occur. Monitoring can be stopped after 5 years provided the success criteria for wetlands and channel stability have been met.

If at the end of the post-construction monitoring period, it is clear that even with adaptive management, the success criteria have not been met, then Wiregrass reserves the right to purchase credits from an approved mitigation bank to make up for whatever shortfall that occurs.

## 8.2 Deliverables

The deliverables for this project are as follows:

- As-constructed drawings for the streams and the wetlands
- Year 1 Monitoring Report
- Year 2 Monitoring Report
- Year 3 Monitoring Report
- Year 4 Monitoring Report
- Year 5 Monitoring Report

# 9.0 COMPLIANCE ISSUES

## 9.1 Introduction

Before the consent order is signed by both parties, Wiregrass must bring its operations into compliance. This involves the development of a new system for handling their mine process water at the Lambert Pit and changes to Pond M which is currently being used to treat stormwater from the plant site.

## 9.2 Process Water

Wiregrass plans to use a closed loop system which involves the use of ponds G, B and A (Figure 14) to treat their process water. Wiregrass will submit a Notice of Intent (NOI) to modify the existing NPDES Permit **AL0078131**. Outfall 001E will be terminated. A proposed new outfall will be requested, to be located along the north side of Pond A. This new outfall will discharge overflow from the closed loop system, when necessary, into an unnamed tributary of Cubahatchee Creek. The facility Pollution Abatement Plan (PAP) will be updated to reflect the changes to the facility.

## 9.3 Stormwater Management

As noted in Section 3.0, Wiregrass decided to not convert Ponds L and M on the Lambert Pit Site to wetlands. Pond M, which has a permitted outfall, is currently used to treat stormwater from the adjacent plant. However, Pond M does not have the required 50-foot buffer between Waters of the US (Cubahatchee Creek) and the stormwater in Pond M. Wiregrass will have to modify Pond M to create the required separation.

The restoration/relocation of Cubahatchee Creek as described in Section 2.0 will establish a 50-foot buffer between Cubahatchee Creek and Pond L thereby creating the opportunity for Wiregrass to use Pond L to treat stormwater. However, the current permit does not include Pond L. Wiregrass would have to design and permit a new outfall before Pond L could be used.

## 9.4 Schedule

It is anticipated that Wiregrass will have to implement the closed loop system and the modifications to Pond M to bring their facilities into compliance before they sign the Consent Order and begin the mitigation work proposed in Sections 2.0 and 3.0.

# 10.0 REFERENCES

Rosgen, D. 1996. Applied River Morphology. Wildland Hydrology, Pagosa Springs, CO

US Army Corps of Engineers, 2016. Federal Public Notice: Notification of Issuance for Guidance for Compensatory Stream and Wetland Mitigation Conducted for Wilmington District. Version 7.8.2014.USGS, 2019.

US Government. 2024, https://ribits.ops.usace.army.mil/ords/f?p=107:2:12306499269457::NO::)

USACE Mobile District. 2012. Compensatory Stream Mitigation Standard Operating Procedures and Guidelines, SAM-2011-317 MBM. Updated 3/13/2024

# FIGURES


Figure 1: Poly Pit Location and Topographic Map
Figure 2: Trace Pit Location and Topographic Map
Figure 3: Lambert Pit Site Mitigation Figure Map
Figure 4: Lambert Pit Site North Mitigation
Figure 5: Lambert Pit Site South Mitigation
Figure 6: Lambert Pit Site East Mitigation
Figure 7a: Lambert Pit Site Annual Bank Erosion
Figure 7b: Lambert Pit Site Annual Bank Erosion
Figure 8: Trace Pit Site Mitigation Figure Key Map
Figure 9: Trace Pit Site North Mitigation
Figure 10: Trace Pit Site Central Mitigation
Figure 11: Trace Pit Site South Mitigation
Figure 12: Lambert Pit Site Restrictive Covenant
Figure 13: Trace Pit Site Restrictive Covenant




# FIGURE 1: SITE LOCATION & TOPOGRAPHIC MAP

WIREGRASS CONSTRUCTION - POLY PIT

AQUATIC FEATURES MITIGATION PLAN

SHORTER, MACON COUNTY, ALABAMA

BASEMAP: Shorter, Alabama, USGS 7.5 Minute Quadrangle Map, 2018 (10-ft Contour Interval).

| |
|---|
| DRAWN BY: DEK |
| CHECKED BY: JSG/CGT |
| DRAWING DATE: 9/23/2022 |
| REVISION DATE: N/A |
| TTL JOB NO.: 000210200423.00 |
| APPROX. SCALE: 1 in = 2,000 ft |




TTL

# FIGURE 2: SITE LOCATION & TOPOGRAPHIC MAP

WIREGRASS CONSTRUCTION - TRACE PIT

AQUATIC FEATURES MITIGATION PLAN

AUTAUGA COUNTY, ALABAMA

BASEMAP: Marbury (N) & Deatsville (S), Alabama, USGS 7.5 Minute Quadrangle Map, 2018 (20-ft Contour Interval).

| | |
|---|---|
| DRAWN BY: DEK | |
| CHECKED BY: JSG/CGT | |
| DRAWING DATE: 9/23/2022 | |
| REVISION DATE: N/A | |
| TTL JOB NO.: 000210201637.00 | |
| APPROX. SCALE: | 1 in = 2,000 ft |




5 | SMOOTH STONES RESTORATION PLLC

**FIGURE 3: LAMBERT PIT SITE MITIGATION FIGURE MAP**

WIREGRASS CONSTRUCTION
SHORTER, MACON COUNTY,
ALABAMA

Drawn by: DAB
Checked by: BWF
11-29-2024




5 | SMOOTH STONES RESTORATION PLLC

# FIGURE 5: LAMBERT PIT SITE SOUTH MITIGATION

WIREGRASS CONSTUCTION
SHORTER, MACON COUNTY, ALABAMA

Drawn by: DAB
Checked by: BWF
11-29-2024




5 | SMOOTH STONES
RESTORATION PLLC

# FIGURE 4: LAMBERT PIT SITE NORTH MITIGATION

WIREGRASS CONSTUCTION
SHORTER, MACON COUNTY, ALABAMA

Drawn by: DAB
Checked by: BWF
11-29-2024




5 | SMOOTH STONES RESTORATION PLLC

# FIGURE 5: LAMBERT PIT SITE SOUTH MITIGATION

WIREGRASS CONSTUCTION
SHORTER, MACON COUNTY, ALABAMA

Drawn by: DAB
Checked by: BWF
11-29-2024




5 | SMOOTH STONES RESTORATION PLLC

**FIGURE 6: LAMBERT PIT SITE EAST MITIGATION**

WIREGRASS CONSTUCTION
SHORTER, MACON COUNTY, ALABAMA

Drawn by: DAB
Checked by: BWF
11-29-2024




Drawn by: DAB
Checked by: BWF
11-29-2024

**FIGURE 7a: LAMBERT PIT SITE**
**ANNUAL BANK EROSION**
WIREGRASS CONSTRUCTION
SHORTER, MACON COUNTY,
ALABAMA

5 SMOOTH STONES RESTORATION PLLC




**FIGURE 7b: LAMBERT PIT SITE**
**ANNUAL BANK EROSION**
WIREGRASS CONSTRUCTION
SHORTER, MACON COUNTY,
ALABAMA




# FIGURE 8: TRACE PIT SITE MITIGATION FIGURE KEY MAP

WIREGRASS CONSTRUCTION
AUTAUGA COUNTY, ALABAMA

| | |
|---|---|
| DRAWN BY : | DAB |
| CHECKED BY : | BWF |
| DRAWING DATE : | 8/14/2024 |
| REVISION DATE : | 11/29/2024 |




| FIGURE 9: TRACE PIT SITE NORTH MITIGATION | |
|---|---|
| WIREGRASS CONSTRUCTION<br>AUTAUGA COUNTY, ALABAMA | DRAWN BY : DAB<br>CHECKED BY : BWF<br>DRAWING DATE : 8/14/2024<br>REVISION DATE : 11/29/2024 |




# FIGURE 10: TRACE PIT SITE CENTRAL MITIGATION

WIREGRASS CONSTRUCTION
AUTAUGA COUNTY, ALABAMA

| | |
|---|---|
| DRAWN BY : | DAB |
| CHECKED BY : | BWF |
| DRAWING DATE : | 8/14/2024 |
| REVISION DATE : | 11/29/2024 |




# FIGURE 11: TRACE PIT SITE SOUTH MITIGATION

WIREGRASS CONSTRUCTION
AUTAUGA COUNTY, ALABAMA

| | |
|---|---|
| DRAWN BY : | DAB |
| CHECKED BY : | BWF |
| DRAWING DATE : | 8/14/2024 |
| REVISION DATE : | 11/29/2024 |




5 | SMOOTH STONES RESTORATION PLLC

**FIGURE 12: LAMBERT PIT SITE RESTRICTIVE COVENANT**

WIREGRASS CONSTUCTION
SHORTER, MACON COUNTY, ALABAMA

Drawn by: DAB
Checked by: BWF
11-29-2024




5 | SMOOTH STONES RESTORATION PLLC

FIGURE 13: TRACE PIT SITE RESTRICTIVE COVENANT

WIREGRASS CONSTRUCTION
AUTAUGA COUNTY, ALABAMA

| | |
|---|---|
| DRAWN BY : | DAB |
| CHECKED BY : | BWF |
| DRAWING DATE : | 8/14/2024 |
| REVISION DATE : | 11/29/2024 |

# APPENDIX A

## Aquatic Resource Impact Calculations

# Trace Pit
# Allstate Materials, LLC & Wiregrass Construction, Inc.

March 2, 2020


MORTAR CREEK
Approximate limits of Trace Pit before site work started. 2006 NAIP


MORTAR CREEK
Approximate limits of Trace Pit after site work started. 2009 NAIP


Approximate limits of Trace Pit after site work started.
2011 NAIP
MORTAR CREEK

**Approximate limits of Trace Pit after site work started. 2013 NAIP**




2013 NAIP
Ditching with Sidecast
Excavation with Sidecast


Approximate limits of Trace Pit after site work started. 2015 NAIP
2015 NAIP And HYDRIC SOIL MAP
2015 NAIP And HYDRIC SOIL MAP


Approximate limits of Trace Pit after site work started.
2015 NAIP


Mortar Creek redirected
Original Channel
2017 NAIP


2019 DG







**01/16/2019 aerial photo of Trace Pit.**
*Mortar Creek flows into mining cell and abandons original channel.*

*Mortar Creek flowing in mined treatment cell*




Mortar Creek flowing through mined treatment cell and exiting cell
Mortar Creek redirected
POND 1
DSCN0276.JPG
09.12.2018 10:31
N 32° 37' 47.48"
W 86° 26' 10.53"
0 ft
Original Channel


09 11 2018 15:14
POND 2
UT3
POND 3
Mortar Creek redirected
POND 4
Original Channel
POND 5
POND 6
Mortar Creek abandons channel and breaches mined treatment cell
2019 DG


UT1
UT2
UT3
UT4
POND 1
POND 2
POND 3
POND 4
POND 5
POND 6
POND 7
POND 8
2019 DG


UT1
UT2
UT3
UT4
POND 1
POND 2
POND 3
POND 4
POND 5
POND 6
POND 7
POND 8
2019 DG



2/26/2017 aerial photo of Mortar Creek confluence with R.E. Woodruff Lake

# Poly Pit

## Wiregrass Construction, Inc.
## Macon County, Alabama

December 10, 2020


Approximate limits of
Poly Pit before site work
started. 2006 NAIP
POLY PIT
CUBAHATCHEE CREEK
0
0.125
0.25
0.5
0.75
1
Miles
A
B
C
D
E
1
2
3
4


Approximate limits of Poly Pit before site work started showing existing features A - C. 2006 NAIP
A
B
C
CUBAHATCHEE CREEK
0 0.125 0.25 0.5 0.75 1 Miles
A B C D E
1 2 3 4


Approximate limits of Poly Pit after site work started. 2009 NAIP
A
B
C
D
E
1
2
3
4
0
0.125
0.25
0.5
0.75
1
Miles


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
Cubahatchee Creek
UT-C
UT-L
Cubahatchee Creek
2009 NAIP
0
0.125
0.25
0.5
0.75
1
Miles
A
B
C
D
E
1
2
3
4



Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
Cubahatchee Creek
UT-C
UT-L
Cubahatchee Creek
2011 NAIP
0
0.125
0.25
0.5
0.75
1
Miles
A
B
C
D
E
1
2
3
4



A
B
C
D
E
1
2
3
4
Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
Cubahatchee Creek
UT-C
UT-L
Cubahatchee Creek
2013 NAIP
0
0.125
0.25
0.5
0.75
1
Miles


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
Cubahatchee Creek
UT-C
UT-L
Cubahatchee Creek
2015 NAIP
0
0.125
0.25
0.5
0.75
1
Miles
A
B
C
D
E
1
2
3
4


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
Cubahatchee Creek
UT-C
UT-L
Cubahatchee Creek
2017 NAIP
0
0.125
0.25
0.5
0.75
1
Miles
A
B
C
D
E
1
2
3
4


A
B
C
D
E
1
2
3
4
Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
Cubahatchee Creek
UT-C
UT-L
Cubahatchee Creek
03/06/2019
0
0.125
0.25
0.5
0.75
1
Miles


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
UT-C IMPACTS
UT-L IMPACTS
Impacts_SA1A
Impacts_SA1B
Impacts_SA1C
Impacts_SA1D
Cubahatchee Creek
UT-C
UT-L
SA1A
SA1B
SA1C
03/06/2019
0
0.125
0.25
0.5
0.75
1
Miles
A
B
C
D
E
1
2
3
4


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
UT-C IMPACTS
Impacts_SA1A
Impacts_SA1B
UT-C
SA1B
SA1A
2011 NAIP
0
312.5
625
1,250
1,875
2,500
Feet
A
B
C
D
E
1
2
3
4


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
UT-C IMPACTS
Impacts_SA1A
Impacts_SA1B
UT-C
2013 NAIP
N
0
A
B
C
D
E
1
2
3
4


UT-C
CUBAHATCHEE CREEK
02/20/2010
© 2010 Pictometry


UT-C
CUBAHATCHEE CREEK
03/10/2012
© 2012 Pictometry



Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
UT-C IMPACTS
Impacts_SA1A
Impacts_SA1B
UT-C
SA1B
2015 NAIP
12/19/2015
© All Pictometry
A
B
C
D
E
1
2
3
4


N
CUBAHATCHEE CREEK
UT-C
03/17/2012
© 2012 Pictometry


N
CUBAHATCHEE CREEK
UT-C
12/19/2015
© All Pictometry



Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
UT-C IMPACTS
Impacts_SA1A
Impacts_SA1B
UT-C
SA1B
SA1A
2017 NAIP
0
312.5
625
1,250
1,875
2,500
Feet
A
B
C
D
E
1
2
3
4


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Intermittent
Stream - Perennial
Artificial Path
UT-C IMPACTS
Impacts_SA1A
Impacts_SA1B
UT-C
SA1B
SA1A
03/06/2019
0
312.5
625
1,250
05.21.2019 14:47
A
B
C
D
E
1
2
3
4


A
B
C
D
E
1
2
3
4
Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Perennial
Artificial Path
UT-L IMPACTS
Impacts_SA1C
Impacts_SA1D
UT-L
Cubahatchee Creek
SA1C
2006 NAIP
0 375 750 1,500 2,250 3,000 Feet


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Perennial
Artificial Path
UT-L IMPACTS
Impacts_SA1C
Impacts_SA1D
UT-L
Cubahatchee Creek
SA1C
2009 NAIP
0 375 750 1,500 2,250 3,000 Feet
A B C D E
1 2 3 4


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Perennial
Artificial Path
UT-L IMPACTS
Impacts_SA1C
Impacts_SA1D
UT-L
Cubahatchee Creek
SA1C
2011 NAIP
0
375
750
1,500
2,250
3,000
Feet
A
B
C
D
E
1
2
3
4


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Perennial
Artificial Path
UT-L IMPACTS
Impacts_SA1C
Impacts_SA1D
UT-L
Cubahatchee Creek
SA1C
2013 NAIP
0
375
750
1,500
2,250
3,000
Feet
A
B
C
D
E
1
2
3
4


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Perennial
Artificial Path
UT-L IMPACTS
Impacts_SA1C
Impacts_SA1D
2015 NAIP
© 2015 Pictometry
02/20/2015
© All Pictometry
A
B
C
D
E
1
2
3
4


A
B
C
D
E
1
2
3
4
Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Perennial
Artificial Path
UT-L IMPACTS
Impacts_SA1C
Impacts_SA1D
UT-L
Cubahatchee Creek
SA1C
N
2017 NAIP
0 375 750 1,500 2,250 3,000
Feet


Legend
NHDPlus Flowlines - Feature Type
Feature Type
Stream - Perennial
Artificial Path
UT-L IMPACTS
Impacts_SA1C
Impacts_SA1D
UT-L
Cubahatchee Creek
SA1C
03/06/2019
0
375
750
1,500
2,250
3,000
Feet
A
B
C
D
E
1
2
3
4


N
03/17/2012
© 2012 Pictometry


N
02/28/2015
© All Pictometry